889 A.2d 501

**COMMONWEALTH of Pennsylvania, Appellee**

v.

**David CHMIEL, Appellant.**

Supreme Court of Pennsylvania.

Argued Oct. 19, 2004.

Decided Dec. 29, 2005.

554

Robert Michael Buttner, James Robert Elliott, Scranton, for David Chmiel.

Amy Zapp, Harrisburg, Patrick J. Blessington, Norristown, for Com.

Before CAPPY, C.J., CASTILLE, NIGRO, NEWMAN, SAYLOR, EAKIN, BAER, JJ.

## OPINION

Justice BAER.

This is a direct appeal from the judgment of sentence of death [1] following the third conviction of David Chmiel (Appellant) for three counts of first-degree murder, two counts of robbery, and one count of burglary [2] arising out of the murder of three victims, Angelina, James, and Victor Lunario, on September 21, 1983.[3] We affirm.

The record reveals that at approximately 9:00 a.m. on September 21, 1983, Mary Drake, a day nurse hired to attend to James Lunario, found James, his sister, Angelina, and brother, Victor, murdered in the home the three shared in Throop, Pennsylvania.[4] According to the autopsy findings, Angelina sustained eleven stab wounds; James sustained ten stab wounds; and Victor sustained twelve stab wounds. Angelina and James also had defensive stab wounds on their hands and/or arms. Based on the physical findings of the autopsy and the visual and auditory accounts provided by eyewitnesses, the medical examiner estimated the time of death of all three victims was between 11:00 p.m. on Tuesday, September 20, 1983, and 2:00 a.m. on Wednesday September 21, 1983.

The time of death was narrowed based upon information provided by several neighbors. One neighbor, who was walking his dog at approximately 11:00 p.m. September 20, observed Victor standing in the kitchen doorway of the Lunario home and heard Angelina call to him. Another neighbor, Linda Sinkevich, was startled by her dog barking at 11:45 p.m.

---

**1.** See 42 Pa.C.S. §§ 722(4), 9711(h)(1); Pa.R.A.P. 702(b) and 1941.

**2.** 18 Pa.C.S. §§ 2502(a), 3701, and 3502, respectively.

**3.** This case represents the third time Appellant has been tried on these charges, his two prior convictions being reversed on direct appeal by this Court. See *Commonwealth v. Chmiel*, 536 Pa. 244, 639 A.2d 9 (1994) (*Chmiel I*) and *Commonwealth v. Chmiel*, 558 Pa. 478, 738 A.2d 406 (1999) (*Chmiel II*). The extensive procedural history of this case, spanning over twenty years, will be discussed *infra*.

**4.** James, who had suffered a stroke, had been discharged from the hospital the previous day.

and, upon looking out of her window, observed a powder blue car with a shiny grill and hood ornament parked close to her own car. Her husband also saw this vehicle when he arrived home between 2:15 and 2:30 a.m. on September 21. Both witnesses stated the vehicle was gone by 8:00 a.m. Mrs. Sinkevich subsequently identified a car shown to her in a photograph as the one she saw in front of her house, and also identified a car at a State Police garage as the one she saw on the night of the murders. The vehicle in the photograph and in the garage belonged to Appellant.

At about 1:20 a.m., another neighbor, Deborah Lahotsky Washenko, let her dog out of the house and, while waiting for its return, heard a scream, which she attributed to one of her neighbors. Between 1:20 a.m. and 1:25 a.m., Pauline Stroka heard a noise, and when she walked onto her porch to investigate, heard Angelina scream "Oh my God, no." Ms. Stroka, who knew James had been ill, did not call the police because she assumed something had happened to him. Based upon these observations the police were able to narrow the time of the murders to between 1:00 a.m. and 2:00 a.m. on September 21.

Upon inspecting the murder scene, the police discovered a sweater sleeve that had been used as a mask during the robbery and murders of the Lunarios. Police inspection of the crime scene also uncovered substantial amounts of money, including $12,296 in cash. The Lunarios kept their cash in envelopes, which they hid in drawers, photo albums, and boxes, and maintained a record of their money by keeping a running tally on the front of the envelopes. While inspecting the home, the police discovered empty envelopes with notations on the front indicating that they had once contained a total of over $4000, which the police concluded had been stolen by the intruder.

With the assistance of the DeGrazio family, who lived next door to the Lunarios, police were able to trace the sweater sleeve mask to Martin Chmiel, Appellant's brother (hereafter, Martin). In the early 1980's, Martin married the DeGrazio's daughter, Mary, and while living in the DeGrazio's home, had

befriended Victor. During their friendship, Victor allowed Martin access to a strongbox, which contained thick envelopes consisting of $100 bills, and lent money to Martin. Thus, Martin knew that the Lunarios had envelopes of cash hidden throughout their house. Just before the murders, Martin had a falling out with Victor that essentially ended their friendship.

The murder investigation revealed that five months prior to the Lunario murders, on April 21, 1983, Appellant was charged with rape, involuntary deviate sexual intercourse, indecent and aggravated assault, terroristic threats, and recklessly endangering another person.[5] Following his arrest for these charges, Appellant retained counsel, Attorney Brier, who demanded payment of a retainer to represent Appellant in proceedings related to these crimes. It was the Commonwealth's theory at trial that Appellant's financial obligation to Attorney Brier provided a motive for the murder and robbery of the Lunarios. Another brother of Appellant, Robert D. Chmiel (hereafter Robert), and Appellant's sister, Nancy Chmiel Moran (hereafter Nancy), confirmed that Appellant needed money to pay his defense attorney. When Appellant told Martin he needed "fast money" to pay his lawyer, Martin informed Appellant about Victor's strongbox of cash and envelopes of money, and Martin and Appellant agreed to burglarize the Lunario home.

**5.** Appellant was subsequently convicted of these crimes in 1983. As discussed in more detail later in this opinion, during the guilt phase of Appellant's murder trial currently on appeal, the defense filed a motion *in limine* to preclude any reference to Appellant's rape charge and subsequent conviction, and the trial court precluded the prosecution from making specific reference to them during the guilt phase. The jury was merely advised that Appellant needed money for a lawyer, but was not informed about the nature of the legal matter. The only mention of these charges was during the penalty phase, when the prosecutor offered evidence of the charges to support a finding of the aggravating circumstance found in 42 Pa.C.S. § 9711(d)(9) ("significant history of felony convictions involving the threat or use of violence to the person"). The jury declined to find this aggravating circumstance, and, instead, found as a mitigating factor Appellant's lack of a significant history of prior criminal convictions pursuant to 42 Pa.C.S. § 9711(e)(1).

Pursuant to their plan to rob the Lunarios, Martin and Appellant fashioned masks out of one of Martin's sweaters. Martin also described to Appellant the layout of the Lunario home. Martin, however, later told police that he subsequently changed his mind because Victor was his friend and he feared he may be seen by his in-laws, who lived next door. Thus, Martin backed out of the plan.

On the morning after the Lunario murders, Appellant and Martin were rebuilding the fire damaged home of their sister Nancy and her husband, Thomas Buffton (hereafter, Mr. Buffton).[6] At 10:30 a.m. on September 21, 1983, Robert's wife visited the construction site and informed Martin that the Lunarios had been murdered the previous night. When Appellant returned to the construction site from gathering supplies, Martin confronted Appellant about the murders. Appellant initially denied any involvement. Later that afternoon, however, Appellant admitted to Martin that he had murdered the Lunarios. Appellant also provided Martin with a detailed account of what had transpired that night.

Appellant's description of the crime, later conveyed to police by Martin, matched the information and evidence found at the crime scene. Specifically, Appellant told Martin that he had tried to enter the Lunarios' home via the cellar door, but upon finding it locked, proceeded to enter the home through the rear door on the first floor. Once inside the home, Angelina, who was sitting on the couch in the living room, cried out, so Appellant killed her to silence her. Appellant told Martin that James also attempted to scream from his hospital bed on the first floor, and Appellant killed him as well. Appellant then proceeded up the stairs to the second floor, where he killed Victor in his bed. Appellant advised Martin that he stole $4,500.00 from the strongbox and $800 from Angelina's purse. Appellant also searched for money under the cushions of the sofa Angelina had been sitting on, and then straightened

6. Mr. Buffton and Martin had conspired to burn the Buffton home so that Mr. Buffton could collect the fire insurance proceeds and rebuild his home. Martin and Mr. Buffton later pled guilty to arson-related offenses resulting from that fire and were both sentenced for those crimes.

Angelina's slumped body into an upright position. Appellant informed Martin that he placed the stolen money in a pillow case he obtained from the Lunario home. After committing the murders and searching the premises for cash, Appellant drove to Martin's home, but was advised by Martin's wife, Mary, that Martin was not home. Later, upon reading a news account of the murders that discussed the substantial sums of money recovered by the police, Appellant told Martin that "it would have been nice to get that" because "as it stands, I only got $1700 for each of them." N.T., 8/26/02, at 33–34.

Within a week of the murders, two witnesses testified to seeing Appellant flash $100 bills while drinking at a neighborhood bar. One of these witnesses, Darryl Crawford, testified that when Appellant's wife contacted him by telephone at the bar, they engaged in a heated argument during which Appellant exclaimed "I'll kill you too." N.T., 8/26/02, at 181.

Based on the sweater sleeve mask found at the Lunario home, the police investigation led to Martin, whom the police questioned on September 28, 1983. Martin initially denied any involvement with or knowledge of the Lunario murders. Upon being confronted by the police with a photograph depicting him wearing the sweater that was used to make the mask, however, Martin informed police of Appellant's confession to him. During the police interview Martin provided details that only the murderer would have known, as no such detailed information had been released to the public.

Included in the details provided to the police by Martin was the fact that the victims had been robbed and that money had been removed from a box in Victor's dresser drawer; the cellar door was locked and the burglar gained entry through an unlocked rear door; Angelina was seated on the sofa, James was in bed on the first floor, and Victor was in an upstairs bedroom; Angelina yelled, and James was unable to do so (because of his stroke); Appellant drove his light blue 1976 Grand Prix to the Lunario home, and parked a couple of blocks away; Appellant wore gloves while committing the crimes and disposed of the murder weapon; Appellant wore one of the sweater masks he and Martin had made; Appellant

searched Angelina's room for money; Appellant repositioned Angelina after he searched under the sofa cushions; and Appellant took a pillow case from the home to carry the money.

Based on the detailed information provided by Martin, the police concluded that he could have learned this information only from the actual murderer. Police ruled out Martin's involvement in the murders by independently verifying his alibi with several impartial sources. According to Martin, he spent the early morning hours of September 21, 1983, with his brother-in-law Mr. Buffton, whom the Lackawanna County Association of Retarded Citizens (ARC) employed to keep watch for brush fires occurring on East Mountain in Scranton, twenty-five minutes from the Lunario home in Throop. Scranton Fire Chief and ARC employees confirmed Martin's alibi for that time period.

At the request of Trooper Gaetano and Trooper Carlson, Martin agreed to wear a wire on September 28, 1983, so that he could meet with Appellant and record their conversation. Arrangements were made for the meeting between Martin and Appellant to take place in a parking lot.[7] During the meeting, Appellant was guarded with his remarks to Martin. Nonetheless, shortly after midnight, following the conclusion of the recorded conversation, the police arrested Appellant.

After arresting Appellant, the police administered *Miranda* warnings and Appellant indicated that he understood his constitutional rights.[8] Appellant, however, agreed to answer Trooper Gaetano's questions. Trooper Gaetano inquired into

7. As Appellant was circling the block upon arriving to meet Martin, Trooper Carlson advised Trooper Gaetano that he intended to move their surveillance vehicle from a nearby street into the parking lot in the hope of achieving a better audio transmission. A disagreement ensued between the officers because Trooper Gaetano feared that such a move would blow their cover. Trooper Carlson persisted and repositioned their Dodge Diplomat. In the process, he inadvertently parked directly next to Appellant, who recognized the vehicle as the one police used earlier that day to transport Martin for questioning from the construction site. As a result, Appellant concluded that Martin was wired.

8. *See Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

Appellant's whereabouts "last Tuesday night" (*i.e.,* September 21, 1983), to which Appellant responded that he had been at home watching television with his wife. When Trooper Gaetano pressed further, Appellant declined to elaborate or provide any more information. The day after Appellant's arrest, police conducted a search of his home. During the search, they discovered $2400 in $50 and $100 dollar bills on top of a hutch in the dining room.

After Appellant's arrest, a Pennsylvania State Police forensic scientist conducted a microscopic analysis of six hairs that were retrieved from the sweater sleeve mask found in Victor's bedroom. When the forensic scientist compared those hairs microscopically with hairs obtained from Appellant, both sets of hairs contained identical features. The forensic scientist concluded that the two hairs found on the mask were microscopically similar to Appellant's hair, and excluded Martin and the Lunarios as sources. In addition, mitochondrial DNA testing revealed that Appellant matched one of the mitochondrial DNA profiles retrieved from two of the hairs found in the sweater sleeve mask.[9]

On September 29, 1983, Appellant was charged with criminal homicide, robbery, burglary, and theft by unlawful taking in connection with the deaths of Angelina, Victor, and James. On October 29, 1984, a jury found Appellant guilty of three counts of murder of the first-degree, two counts of robbery, one count of burglary, and two counts of theft by unlawful taking. Following completion of the penalty phase of trial, the jury sentenced Appellant to death. Appellant filed counseled post-trial motions as well as a *pro se* petition alleging that Attorney Kennedy had been ineffective for, *inter alia*, making no effort to locate alibi witnesses, discouraging him from taking the stand, and failing to request an accomplice instruc-

9. Humans have both nuclear DNA and mitochondrial DNA. N.T., 8/29/2002, at 151. Mitochondrial DNA is found outside of the cell nucleus, in the mitochondria, *id.* at 152, and is inherited only from one's mother (distinguishable from DNA forming the nucleus of each cell, which is inherited from both parents). For a general discussion, *see* Edward K. Cheng, *Mitochondrial DNA: Emerging Legal Issues,* 13 J.L. & Pol'y 99 (2005).

tion as to Martin's testimony. The trial court appointed new counsel, stayed the post-trial motions, and held an evidentiary hearing (treated as a hearing pursuant to the then-effective Post Conviction Hearing Act (PCHA), 42 Pa.C.S. §§ 9541–9551) on the ineffectiveness claims. Following the hearing, at which Attorney Kennedy testified, the trial court denied the motions for a new trial and for PCHA relief and formally imposed the sentence of death. On direct appeal, this Court reversed Appellant's conviction on grounds that Attorney Kennedy had been ineffective for failing to request an accomplice witness instruction regarding Martin's testimony. *Chmiel I*, 639 A.2d at 9.

After reversal of Appellant's first conviction, he was retried for the Lunario murders. Prior to trial, Appellant filed an omnibus motion requesting, *inter alia*, that the trial court preclude the use at trial of the testimony given by Attorney Kennedy at the 1988 PCHA evidentiary hearing on the basis that this testimony had impermissibly disclosed confidential attorney-client communications by revealing that Appellant had told him more than one version of events and of his whereabouts on the night of the murders. *See Chmiel II*, 738 A.2d at 409. The trial court denied the motion. Accordingly, during the second trial, the prosecution introduced testimony provided by Attorney Kennedy during the prior PCHA hearing. On March 2, 1995, a second jury found Appellant guilty of three counts of murder in the first-degree, two counts of robbery, and one count of burglary. At the conclusion of the penalty phase, the jury sentenced Appellant to death. On August 19, 1999, on direct appeal to this Court, we reversed Appellant's second conviction on the basis that the testimony of Attorney Kennedy from the PCHA hearing should not have been admitted into evidence during Appellant's second trial because the use of that testimony violated Appellant's right against compelled self-incrimination and his right to effective assistance of counsel. *Chmiel II*, 738 A.2d at 413.

On February 16, 2000, the record in this case was remanded back to the trial court, which scheduled trial for May 30, 2000. On May 1, 2000, Appellant filed various pre-

trial motions, including a motion to dismiss the prosecution on double jeopardy grounds based upon prosecutorial misconduct.[10] On May 22, 2000, the trial court disposed of Appellant's motions, including the assertion of double jeopardy. Appellant took an interlocutory appeal to the Superior Court challenging the trial court's refusal to dismiss for twice placing him in jeopardy. The Superior Court affirmed the trial court, and we denied review.[11] *See Commonwealth v. Chmiel*, 777 A.2d 459 (Pa.Super.2001), *allocatur denied, Commonwealth v. Chmiel*, 567 Pa. 736, 788 A.2d 372 (2001), *cert. denied, Chmiel v. Pennsylvania*, 535 U.S. 1059, 122 S.Ct. 1921, 152 L.Ed.2d 829 (2002).

After Appellant exhausted his appeals on the double jeopardy claim, the trial court rescheduled trial to begin on August 5, 2002. During *voir dire*, which was conducted from August 5 to August 15, 2002, Juror No. 5 indicated that he probably would not want to impose the death penalty, but would do so if required. This juror then left the room so defense counsel and the prosecutor could announce whether he was acceptable. Both defense counsel and the prosecutor stated that he was acceptable, and Juror No. 5 was summoned back into the room. Before he could be advised of his acceptance, he volunteered that he had something more to say, and further opined, unsolicited, that he was having a hard time with the idea of imposing the death penalty. Consequently, the trial

**10.** Double jeopardy bars retrial where the prosecutor's misconduct was intended to provoke the defendant into moving for a mistrial or when the conduct of the prosecutor is intentionally undertaken to prejudice the defendant to the point of the denial of a fair trial. *Chmiel*, 777 A.2d at 463; *see also Oregon v. Kennedy*, 456 U.S. 667, 102 S.Ct. 2083, 72 L.Ed.2d 416 (1982); *Commonwealth v. Smith*, 532 Pa. 177, 615 A.2d 321, 325 (1992); *Commonwealth v. Simons*, 514 Pa. 10, 522 A.2d 537 (1987).

**11.** Appellant appealed the denial of his motion to dismiss as a collateral order. Pa.R.A.P. 313(b) ("A collateral order is an order separable from and collateral to the main cause of action where the right involved is too important to be denied review and the question presented is such that if review is postponed until final judgment in the case, the claim will be irreparably lost."); *Commonwealth v. Brady*, 510 Pa. 336, 508 A.2d 286, 289–91 (1986) (allowing an immediate appeal from denial of double jeopardy claim under collateral order doctrine where trial court makes a finding that motion is not frivolous).

court resumed questioning him. Juror No. 5 went on to explain that he was Catholic and did not know if he would be able to impose the death penalty even if the law required it. In light of these statements the prosecutor moved to strike Juror No. 5 for cause. The trial court denied the prosecutor's motion to strike for cause, but allowed the prosecutor to exercise a peremptory challenge.

Trial proceeded. Appellant testified and denied any involvement with the murders and robbery of the Lunarios, claiming that his prosecution for those crimes was the result of a conspiracy involving Trooper Gaetano, Martin, Mr. Buffton, and others. In earlier trials for the Lunario murders in 1988, Appellant had stated under oath that he could not identify or produce any person who could account for his whereabouts between 1:00 a.m. and 2:15 a.m. on the morning of the murders. By the time of his third trial, Appellant had changed his alibi. Although he told the police upon his arrest that he had been home watching television with his wife, at trial he testified that he had been at the home of Patrick Battle from 11:00 p.m. on Tuesday, September 20, 1983 to 1:30 a.m. Wednesday morning on September 21, 1983 to watch the double-header between the Baltimore Orioles and the Detroit Tigers. Mr. Battle, however, testified that the double-header had been Wednesday night, almost twenty-four hours after the murders. Appellant further testified that after the baseball games, he drove to Martin's residence, arriving by 1:45 a.m. However, according to Martin's wife, Mary, Appellant arrived at her home at 3:45 a.m. on September 21, 1983. Another witness, Daniel McGlynn, testified that at 4:00 a.m. he had observed Appellant in a restaurant located one mile from the Lunarios' home.

On September 6, 2002, the jury found Appellant guilty of three counts of first-degree murder, two counts of robbery and one count of burglary. During the penalty phase of the trial, the prosecutor asserted the following aggravating circumstances: (1) the murders were committed in the perpetration of a felony (robbery or burglary), 42 Pa.C.S. § 9711(d)(6); (2) Appellant's convictions for rape, assault, terroristic threats,

and recklessly endangering another person constituted a significant history of felony convictions involving the use or threat of violence to another person, 42 Pa.C.S. § 9711(d)(9); and (3) by virtue of his multiple murder convictions in this case, Appellant had been convicted of another murder either before or at the time of the offenses at issue, 42 Pa.C.S. § 9711(d)(11).

Appellant countered that the following mitigating circumstances were present: (1) Appellant had no significant history of prior criminal convictions, 42 Pa.C.S. § 9711(e)(1); (2) Appellant lacked the capacity to appreciate his conduct or to conform his conduct to the requirements of law due to substantial impairment by alcohol, 42 Pa.C.S. § 9711(e)(3); and (3) other evidence of mitigation existed concerning the character and record of Appellant and the circumstances of his offense: (a) family relationships, (b) abusive upbringing, (c) religious practice, (d) military service, (e) prison record, and (f) relationship with his daughter, 42 Pa.C.S. § 9711(e)(8).

On September 10, 2002, at the conclusion of the penalty phase, the jury returned a death penalty verdict. As to the murder of each of the three victims, the jury found two aggravating circumstances: (1) the commission of a murder in the perpetration of a robbery or burglary; and (2) multiple murder convictions for the murders of the Lunarios. The jury concluded that Appellant did not have a significant history of felony convictions involving the use or threat of violence to another person. The jury further found the following mitigating circumstances: (1) the absence of a significant history of prior criminal convictions, and (2) "other evidence of mitigation" as a result of his family relationships and abusive upbringing. The jury unanimously concluded that the aggravating circumstances outweighed the mitigating circumstances and thereby sentenced Appellant to death. The court sentenced Appellant on October 1, 2002, to three death sentences and fourteen to thirty-two years of incarceration on the robbery and burglary convictions.

On October 15, 2002, Appellant filed post-sentence motions. After obtaining new counsel, Appellant filed an amended post-

574

sentence motion adding claims of ineffective assistance of trial counsel. The trial court held an evidentiary hearing on the amended post-sentence motion, including ineffectiveness claims, on June 12, 2003, at which time Appellant's trial counsel presented testimony. On August 20, 2003, the trial court issued a memorandum and order in which it denied all of Appellant's claims. Pursuant to the automatic direct appeal provisions found in 42 Pa.C.S. § 722(4) and § 9711(h)(1), the case progressed to this Court for our review.

## I. Sufficiency of the Evidence

We turn first, as we do in all cases where the death penalty has been imposed, to our independent review of the evidence to ensure that it is sufficient to support Appellant's convictions for first-degree murder. *Commonwealth v. Zettlemoyer,* 500 Pa. 16, 454 A.2d 937, 942 n. 3 (1982), *cert. denied,* 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983). We do so notwithstanding that Appellant does not challenge the sufficiency of the evidence. *Commonwealth v. Freeman,* 573 Pa. 532, 827 A.2d 385 (2003). In reviewing the sufficiency of the evidence, we must determine whether the evidence admitted at trial, and all reasonable inferences drawn therefrom when viewed in the light most favorable to the Commonwealth as verdict winner, are sufficient to establish all of the elements of the offense beyond a reasonable doubt. *Commonwealth v. Bridges,* 563 Pa. 1, 757 A.2d 859, 864 (2000). We must also bear in mind that:

the Commonwealth may sustain its burden by means of wholly circumstantial evidence; the entire trial record should be evaluated and all evidence received considered, whether or not the trial court's rulings thereon were correct; and the trier of fact, while passing upon the credibility of witnesses and the weight of the proof, is free to believe all, part, or none of the evidence.

*Commonwealth v. Watkins,* 577 Pa. 194, 843 A.2d 1203, 1211 (2003).

In order to sustain a finding of first-degree murder, the evidence must establish that (1) a human being was

unlawfully killed; (2) the person accused is responsible for the killing; and (3) the accused acted with a specific intent to kill. 18 Pa.C.S. § 2502(a); *Commonwealth v. Spotz*, 563 Pa. 269, 759 A.2d 1280, 1283 (2000). An intentional killing is a "killing by means of poison or by lying in wait, or any other kind of willful, deliberate, and premeditated killing." 18 Pa.C.S. § 2502(d). Specific intent to kill can be established through circumstantial evidence such as the use of a deadly weapon upon a vital part of the victim's body. *Commonwealth v. Ramos*, 573 Pa. 605, 827 A.2d 1195 (2003); *Commonwealth v. Walker*, 540 Pa. 80, 656 A.2d 90, 95 (1995).

The evidence adduced at trial, viewed in the light most favorable to the Commonwealth as verdict winner, established that Angelina was stabbed a total of eleven times, with a vital organ punctured four times; James sustained ten stab wounds, including six fatal wounds; and Victor suffered twelve stab wounds, eight of which were fatal. Thus, the evidence established the repeated use of a deadly weapon upon vital parts of the victims' bodies sufficient to demonstrate the specific intent to kill beyond a reasonable doubt. *See Ramos, Walker*, supra.

■ Further, although proof of motive is not necessary for a conviction of first-degree murder, *see Commonwealth v. Zimmerman*, 351 Pa.Super. 5, 504 A.2d 1329 (1986), the Commonwealth demonstrated that Appellant needed money to pay his attorney a retainer and had a compelling motive to burglarize the home. Although Appellant was not able to pay his attorney prior to the burglary, he was seen displaying $100 bills and $2400 was seized from his home on September 29, 1983.

Moreover, Appellant confessed to Martin that he broke into the Lunario home alone and, once inside, intentionally killed the three Lunario siblings. Appellant stole $5300 from the home, which he carried away in a pillowcase. He subsequently provided his brother with numerous details of the crime that had not been made public. In addition to Martin's testimony, Mrs. Sinkevich saw Appellant's car in the vicinity of

the Lunario home at the time of the murders. The police recovered from the crime scene the sweater sleeve that had been used as a mask during the robbery. When the hairs from the sweater-mask were compared to Appellant's hair, both sets of hair were microscopically similar. By his own admission, Appellant could not identify an alibi witness or otherwise account for his whereabouts between 1:00 a.m. and 2:15 a.m. on the morning of the murders. Daniel McGlynn observed Appellant in a restaurant near the murder scene in the early morning of September 21, 1983.

Based on the evidence presented, the jury could have concluded beyond a reasonable doubt that Appellant acted with specific intent to kill the Lunario siblings. Each of these victims was brutally stabbed to death; and the jury concluded that Appellant committed the killings. Accordingly, the evidence was sufficient to sustain Appellant's convictions for first-degree murder.

Having resolved the sufficiency of the evidence inquiry, we now turn to the claims raised by Appellant.

## II. *Voir Dire*

██ In his first claim of trial court error, Appellant argues that the trial court erred and abused its discretion by allowing the prosecutor to exercise a peremptory challenge in violation of Pa.R.Crim.P. 631 [12] after Juror No. 5 was accepted by both

12. Specifically, the rule provides, in relevant part:
 (E) In capital cases, the individual *voir dire* method must be used, unless the defendant waives that alternative.
 (1) Individual *Voir Dire* and Challenge System
 (a) Voir dire of prospective jurors shall be conducted individually and may be conducted beyond the hearing and presence of other jurors.
 (b) Challenges, both peremptory and for cause, shall be exercised alternately, beginning with the attorney for the Commonwealth, until all jurors are chosen. Challenges shall be exercised immediately after the prospective juror is examined. **Once accepted by all parties, a prospective juror shall not be removed by peremptory challenge.** Without declaring a mistrial, a judge may allow a challenge for cause at any time before the jury begins to deliberate, provided sufficient alternates have been selected, or the defendant consents to be tried by a jury of fewer than 12, pursuant to Rule 641.
 Pa.R.Crim.P. 631(E)(1)(a) & (b) (emphasis added).

defense counsel and the prosecutor. Based on the language of Rule 631, Appellant argues that although a juror, after being accepted by both parties, may be stricken for cause, a juror "shall" not be stricken by way of peremptory challenge.

▮ Appellant argues it is clear that the language of the current Rule 631 is restrictive and unambiguous. Here, the juror was accepted by both parties, then stricken after the trial court found that no cause existed to strike the juror. Appellant avers that the trial court exercised discretion which, under Rule 631, does not exist. Therefore, Appellant argues that under Rule 631(E), Juror No. 5 was required to sit as a juror.[13]

Appellant also argues he was prejudiced by the Commonwealth's improper use of a peremptory challenge because the jury returned a sentence of death after finding that mitigating circumstances were outweighed by aggravating circumstances. Appellant argues that the scrutiny under which Juror No. 5 would have placed the facts presented did not occur because of his removal, and Appellant was therefore denied due process in the selection of the jury.

The Commonwealth points to the language of Rule 631(E)(1)(b) that a challenge to a juror, whether peremptory or for cause, "shall be exercised *immediately after the prospective juror is examined.*" Pa.R.Crim.P. 631(E)(1)(b) (em-

13. Neither the Commonwealth nor Appellant takes issue with the trial court's determination that cause did not exist to strike Juror No. 5. Although Appellant cites to and discusses cases dealing with constitutional principles governing the dismissal of prospective jurors for cause based on their view of the death penalty, these principles do not come into play here because Juror No. 5 was not dismissed for cause. *See Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968) (enunciating the standard for removal of jurors leading towards a "death qualified jury"); *Wainwright v. Witt,* 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985) ("[A] juror may not be challenged for cause based on his views about capital punishment unless those views would prevent or substantially impair the performance of his duties as a juror in accordance with his instruction and his oath."). Dismissal for cause and by peremptory challenge are very different things. A challenge for cause is directed at a prospective juror's ability to serve, while a peremptory challenge may be exercised for any reason or no reason at all. *Commonwealth v. Evans,* 212 Pa. 369, 61 A. 989 (1905).

phasis added). The Commonwealth avers that Juror No. 5's examination was not complete until the court received the supplemental clarifying information the juror felt compelled to provide. The Commonwealth argues that Appellant is only entitled to relief on this issue if the trial court abused its discretion, which it suggest did not occur here.

Appellant disagrees with the Commonwealth's reasoning that *voir dire* had resumed before Juror No. 5 could be informed that he was accepted. Specifically, Appellant notes that the record reflects that both parties had, of their own volition, completed their questioning and had informed the trial court that Juror No. 5 was acceptable, which indicates that the examination had ceased. Further, Appellant argues that there exists no language within Rule 631 that declares that *voir dire* is completed only when the juror is informed that he or she has been accepted. Rather, Appellant notes that the rule explicitly states, "Once accepted by all parties, a prospective juror shall not be removed by peremptory challenge." Pa.R.Crim.P. 631(E)(1)(b).

 A defendant has a right to an impartial jury pursuant to the Sixth and Fourteenth Amendments to the United States Constitution and Article 1, § 9 of the Pennsylvania Constitution. *Ross v. Oklahoma,* 487 U.S. 81, 85, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988); *Commonwealth v. Ingber,* 516 Pa. 2, 531 A.2d 1101, 1102 (1987). Appellant carries the burden of showing that his jury was not impartial. *See Ross.* 487 U.S. at 86, 108 S.Ct. 2273. In a death penalty case, individual *voir dire* is mandated by Pa.R.Crim.P. 631(E), which provides that there are two ways in which a juror may be stricken from serving, where cause exists indicating that the juror cannot follow the law or possesses some bias toward the Commonwealth or defendant, or arbitrarily by peremptory challenge. The process of selecting a jury is committed to the sound discretion of the trial judge and will be reversed only where the record indicates an abuse of discretion. *Commonwealth v. Chambers,* 546 Pa. 370, 685 A.2d 96, 110 (1996).

We find no support for Appellant's contention that pursuant to Rule 631 the trial court has no discretion in conducting *voir dire*. We have repeatedly held that "[t]he scope of the *voir dire* rests in the sound discretion of the trial judge, whose decision will not be reversed unless palpable error is established. The purpose of *voir dire* is to ensure the empanelling of a fair and impartial jury capable of following the instructions of the trial court." *Commonwealth v. Robinson*, 581 Pa. 154, 864 A.2d 460, 484 (2004) (citing *Bridges*, 757 A.2d at 872 (internal citation omitted), *cert. denied*, 535 U.S. 1102, 122 S.Ct. 2306, 152 L.Ed.2d 1061, (2002)); *see also Commonwealth v. Marrero*, 546 Pa. 596, 687 A.2d 1102, 1107 (1996), *cert. denied*, 522 U.S. 977, 118 S.Ct. 434, 139 L.Ed.2d 334, (1997); *Commonwealth v. (James) Smith*, 518 Pa.15, 540 A.2d 246, 256 (1988) ("The purpose of the *voir dire* examination is not to provide a better basis upon which a defendant can exercise his peremptory challenges, but to determine whether any venireman has formed a fixed opinion as to the accused's guilt or innocence.").

Juror No. 5 was examined and accepted first by defense counsel, then by the prosecutor. When he was recalled to the courtroom to be advised of this, before anything was communicated to him, he asked the court if he could say something. He proceeded to tell the court and counsel: "I don't really know how I would feel about the death penalty. I don't know." N.T., 8/6/2002, at 105. In the face of this spontaneous statement, the trial court resumed the examination and proceeded to question him further about his ability to serve as a juror. Juror No. 5 responded by expressing his concerns about whether he could actually impose the death penalty: "I just deep down don't know if I'd be able to do it, if I'd be leaning towards life if he was convicted ... if I would be persuaded to go to life ... because I don't want to make that decision." [14] *Id.* After the additional examination, the prosecu-

14. Juror No. 5's examination concluded with this exchange:

> [The Court]: But realizing you will decide the facts and I will tell you what the law is, if you take those facts as you find them and apply it to the law and say it should be life imprisonment, you would vote for life imprisonment. But ... if you believe when you apply it that it

tor moved to strike for cause. The court denied that motion based on the juror's statements that he believed he could follow the law, but indicated that it would allow the prosecutor and defense counsel the opportunity to exercise a peremptory challenge if either wished. N.T., 8/06/02, at 112. The trial court overruled defense counsel's objection that only a challenge for cause was permissible at that stage.

There is no support for Appellant's position that Juror No. 5 had been conclusively "examined" prior to the Commonwealth's exercise of its peremptory challenge. The requirement in Rule 631 that peremptory challenges may not be used after the prospective juror is accepted by both parties must be read in context of the other requirement in the rule that peremptory challenges are to be used only after the prospective juror is examined. *See* Pa.R.Crim.P. 631(E)(1)(b) ("Challenges shall be exercised immediately after the prospective juror is examined."). Examined in its totality, it is clear from the language of the rule that a party's motion to use a peremptory challenge is proper only when examination of the prospective juror is complete. Although both parties indicated their acceptance of Juror No. 5, the fact remains that before the juror was advised of his acceptance and after he was summoned back into the courtroom, he spontaneously expressed a desire to clarify his position on the death penalty. The trial court, exercising its discretion, resumed the examination of the juror, which was within its discretion to do given its perception that the unsolicited remarks were "somewhat at variance with his earlier comments." Tr. Ct. Op. at 64. It was only after the examination was resumed and completed that the prosecutor used a peremptory challenge.

> would be the death penalty, and all the other 11 jurors agree, you would follow the law and cast that vote [for the death penalty] if need be?
> [Juror No. 5]: I would hope I could because I don't know, I was never under that situation.
> [The Court]: We understand, we're asking these questions in a vacuum.
> [Juror No. 5]: Being a Catholic it's a tough decision for me. I do agree with it, but could I personally do it? I was never faced with it so I don't know.
> N.T., 8/6/02, at 108.

Based on the concerns raised by the juror, the trial court properly allowed the parties the opportunity to exercise a peremptory challenge. *Cf. Commonwealth v. Proctor*, 526 Pa. 246, 585 A.2d 454, 460 (1991) (finding that even though juror had been accepted by the Commonwealth and defense, the court did not abuse its discretion in allowing the Commonwealth to challenge the juror after he "he was reexamined by both the Commonwealth and the Court" and indicated "that he would be unable to follow the Court's instruction as to the legal definition of premeditation"). Accordingly, Appellant has not demonstrated an abuse of discretion by the trial court. As it falls within the trial court's discretion to resume the examination upon a prospective juror's spontaneous clarifications, the trial court properly followed the mandates of Rule 631 by offering both parties the opportunity to exercise peremptory challenges. Appellant's argument in this regard fails.

### III. Admission of evidence

Appellant argues that the trial court erred on five occasions when it admitted evidence over defense counsel's objection. The admissibility of evidence rests within the sound discretion of the trial court, and its decision will be reversed only upon a showing that the it abused its discretion. *Commonwealth v. Boczkowski*, 577 Pa. 421, 846 A.2d 75 (2004); *Commonwealth v. Reid*, 571 Pa. 1, 811 A.2d 530, 550 (2002). Further, an erroneous ruling by a trial court on an evidentiary issue does not require us to grant relief where the error was harmless. *Commonwealth v. Young*, 561 Pa. 34, 748 A.2d 166, 193 (1999). The Commonwealth bears the burden of demonstrating harmless error. *Commonwealth v. Mayhue*, 536 Pa. 271, 639 A.2d 421, 433 (1994).

Harmless error exists where: (1) the error did not prejudice the defendant or the prejudice was *de minimis;* (2) the erroneously admitted evidence was merely cumulative of other untainted evidence which was substantially similar to the erroneously admitted evidence; or (3) the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so

insignificant by comparison that the error could not have contributed to the verdict.

*Commonwealth v. Robinson*, 554 Pa. 293, 721 A.2d 344, 350 (1998). With this in mind, we proceed to review seriatim the challenged evidentiary rulings.

## A. Admissibility of Vehicle Identification

■ Appellant avers that the trial court erred and abused its discretion by allowing the prosecutor, over defense counsel's objection, to present Mrs. Sinkevich's vehicle identification. According to Mrs. Sinkevich's testimony, she looked out of her front window at 11:45 p.m. on September 20, 1983, and saw a "big car parked nose to nose with my car." N.T., 8/21/02, at 155. She described the color of the car as powder blue with a hood ornament and a shiny grill and stated that she had never seen the car before. *Id.* at 156–57. Upon relaying this information to the police during the murder investigation, the police showed her a photograph of Appellant's big, powder blue car, which she identified as the vehicle that she had seen parked in front of her house.[15] *Id.* at 160–61. On September 29, 1983, Mrs. Sinkevich and her husband went to a garage at the police barracks, to identify the car in person. She walked alone on a ramp through the garage looking at parked cars until she saw a car that "looked just like the one that was parked in front of [her] house." *Id.* at 161–62. This was Appellant's vehicle. At trial, she testified that the car in the barracks was the same one she saw in front of her house on the night of September 20, 1983.

■ Prior to Appellant's previous two trials, Appellant unsuccessfully sought to preclude this testimony by relying on case-law concerning the requirements for permissible in-court identification of an accused and asserting that the identification procedure used by police was highly and unfairly suggestive in violation of the Pennsylvania and United States Constitutions. Before the most recent trial, Appellant again sought to preclude this identification testimony. Relying on the

15. It is undisputed that this was a photograph of Appellant's car.

coordinate jurisdiction doctrine, the trial court found the prior trial court's earlier decisions allowing the testimony applicable.[16] The court's earlier decisions relied on *Commonwealth v. Carter*, 271 Pa.Super. 508, 414 A.2d 369 (1979), holding that the constitutional protections afforded during the identification of a person do not apply to the identification of a vehicle. Appellant asserts that *Carter* is still the only case on point in the Commonwealth, and asks us either to abrogate it or to limit its application.

In *Carter*, police were asked to investigate two men acting suspiciously on a Philadelphia street corner. 414 A.2d at 370. As the officers approached, the defendant and another man were running toward them. The officers observed that the defendant was holding a bag with a gun protruding. The officers stopped the men and placed them in their car. Just then the police received information that a neighborhood bar had been robbed by a suspect wearing clothes similar to those worn by the defendant. The defendant was taken to the bar for identification by the patrons. The bar patrons identified the brown bag and gun barrel, which were then being carried by an officer as the object carried by the robber. The bartender also identified the bag and barrel.

Concerning the identification of the bag and gun, the Superior Court declined to afford the same protections to real evidence that are afforded to the identification of a person:

> One of the purposes of invoking such stringent requirements on testimony relating to the identity of the accused is

**16.** Pursuant to the coordinate jurisdiction doctrine, "[J]udges of coordinate jurisdiction sitting in the same case should not overrule each others' decisions." *Commonwealth v. Starr*, 541 Pa. 564, 664 A.2d 1326, 1331 (1995). "Departure ... is allowed only in exceptional circumstances such as where there has been an intervening change in the controlling law, a substantial change in the facts or evidence giving rise to the dispute in the matter, or where the prior holding was clearly erroneous and would create a manifest injustice if followed." *Id.* at 1332. The rule serves "not only to promote the goal of judicial economy" but also "(1) to protect the settled expectations of the parties; (2) to insure uniformity of decisions; (3) to maintain consistency during the course of a single case; (4) to effectuate the proper and streamlined administration of justice; and (5) to bring litigation to an end." *Id.* at 1331; *Ryan v. Berman*, 572 Pa. 156, 813 A.2d 792, 795 (2002).

the enormous probative weight of such evidence, ofttimes deciding the issue by its admission alone. Identification of an item of real evidence, however, does not generally have this effect. Consequently, it has never been the case that identification of an object must be subject to the same precautions given the identification of a person. Rather, any uncertainty in the description, or suggestivity in a prior identification, goes to the weight to be accorded the testimony, not its admissibility.

*Carter*, 414 A.2d at 373.

Appellant argues that unlike *Carter*, this is an instance in which the identification of the item, *i.e.*, the vehicle, had the effect of identifying Appellant himself. Further distinguishing *Carter*, Appellant notes that the vehicle identification did not occur on the day of the crime, no one identified Appellant at the scene, and the later identification carried great weight in inculpating Appellant. Additionally, Appellant argues that the identification offered by Mrs. Sinkevich was not positive because she could only say that the car she saw in the garage looked similar to one she saw parked in front of her house and the one she later saw in the photograph. Finally, Appellant argues that showing Mrs. Sinkevich the picture of Appellant's car prior to having her pick out the car in the garage was unduly suggestive, thereby tainting the identification testimony.

In contrast, the Commonwealth notes that *Carter's* holding has not been modified in any way by this Court or the Superior Court and had to be considered binding precedent by the trial court. Moreover, the Commonwealth submits that *Carter's* rationale has been endorsed by courts in other jurisdictions that have highlighted the very different risks inherent in the identification of human beings as opposed to inanimate objects. *See State v. Crannell*, 170 Vt. 387, 750 A.2d 1002, 1012–13 (2000) (rejecting defendant's contention that identification of his automobile was impermissibly suggestive, quoting *Carter* with approval, and declining "to create a rule requiring police to provide a photo array of an object such as a car"); *People v. Miller*, 211 Mich.App. 30, 535 N.W.2d 518, 523 (1995)

(citing *Carter* with approval). Finally, the Commonwealth argues that any trial court error in this regard was harmless because Appellant's counsel had the opportunity to challenge the identification as being untrustworthy for various reasons and did so. N.T., 8/21/02, at 167–179 (cross examination of Mrs. Sinkevich) and N.T., 9/06/02, at 67–69 (closing argument of defense counsel).

To be sure, a pretrial procedure in which a witness views a photograph of the accused in an effort to "elicit identification evidence is peculiarly riddled with innumerable dangers and variable factors which might seriously, even crucially, derogate from a fair trial." *United States v. Wade,* 388 U.S. 218, 228, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967); *see also Simmons v. United States,* 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968); *Gilbert v. California,* 388 U.S. 263, 272, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967). If such an identification procedure of the accused is "so unnecessarily suggestive and conducive to irreparable mistaken identification, [the accused] is denied due process of law." *Stovall v. Denno,* 388 U.S. 293, 302, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967). It is clear, then, that photographic identification of a person is unduly suggestive if, under the totality of the circumstances, the identification procedure creates a substantial likelihood of misidentification. *See Commonwealth v. DeJesus,* 580 Pa. 303, 860 A.2d 102 (2004).

Neither the United States Supreme Court nor our Court has addressed whether the decisions in *Wade, Gilbert,* and *Stovall* extend the protections that are necessary for identification testimony of an accused to that of inanimate objects. However, almost every jurisdiction applies the test articulated in the *Wade* trilogy to the identification of a person, not physical evidence that might establish the defendant's guilt. *See United States v. Zenone,* 153 F.3d 725 (4th Cir.1998) (holding the due process clause inapplicable to witness identification of the weapons used by the robbers to link the defendant to the crime); *Johnson v. Sublett,* 63 F.3d 926, 932 (9th Cir.1995) ("*Stovall* and its progeny do not require car line-ups ...."); *Dee v. State,* 273 Ga. 739, 545 S.E.2d 902 (2001)

(finding the *Wade* trilogy test inapplicable to identification a gun, even though the procedure used was suggestive); *Hughes v. State*, 735 So.2d 238, 261 (Miss.1999); *Miller*, 535 N.W.2d at 523 ("Any suggestiveness in the identification of inanimate objects is relevant to the weight, not the admissibility, of the evidence."); *Brooks v. State*, 560 N.E.2d 49, 57–58 (Ind.1990); *State v. Roscoe*, 145 Ariz. 212, 700 P.2d 1312 (1984) (*en banc* ); *State v. Cyr*, 122 N.H. 1155, 453 A.2d 1315, 1317–18 (1982); *State v. King*, 31 Wash.App. 56, 639 P.2d 809, 811–12 (1982); *Iowa v. Bruns*, 304 N.W.2d 217 (Iowa 1981); *People v. Coston*, 40 Colo.App. 205, 576 P.2d 182, 185 (1977); *Inge v. Commonwealth*, 217 Va. 360, 228 S.E.2d 563, 567 (1976); *Bear v. Halford*, 2001 WL 34152086 (N.D.Iowa 2001).

Several of these cases involved in-court automobile identification. For example, in *Roscoe*, a kidnapping case in which the witness identified the defendant's vehicle as the car he had seen leaving the scene of the crime, the Arizona Supreme Court rejected the defendant's argument that the police should have utilized a line-up procedure for the vehicle identification. The court noted that "[b]y the great weight of authority, the right to pretrial identification procedures is inapplicable to items of physical evidence." 700 P.2d at 1324. Based on that reasoning, the court held that "[f]actors surrounding automobile identifications, such as the suggestiveness of the proceedings, affect only the weight, and not the admissibility, of the evidence." *Id.* Likewise, the Iowa Supreme Court in *Bruns* declined to afford the pre-trial identification of inanimate objects the same protections afforded to the identification of the accused:

> The pretrial identification by a victim of a car in which the crime occurred does not implicate the due process rights of a defendant. While the procedure used here, identification of an impounded car by a young victim at the request of police, may make the evidence of the identification suspect, it does not give rise to a claim of denial of due process that will result in suppression of the evidence. If the identification of the car was suspect, the credibility of the identification witnesses could properly be placed before the trier of

fact by cross-examination and final argument. The weight of the identification evidence is for the trier of fact.

*Bruns*, 304 N.W.2d at 219; *Dee*, 545 S.E.2d at 903.

We agree with the other states that have examined the issue that there is no basis for applying the identification procedures applicable to suspects to testimony identifying inanimate objects and we decline to extend cases protecting the accused's rights to a fair pre-trial identification to the pre-trial identification of physical evidence. There is a difference between an identification of a defendant and of an inanimate object. The due process concerns implicated in identification of a defendant are not implicated in the identification of a vehicle. Identification of an accused tends to be direct proof of the case against him, while that of an inanimate object is only indirect proof of the defendant's guilt. This principle is even more compelling in this instance because motor vehicles are not unique. On the other hand, there is only one person with the physical characteristics exactly like those of the defendant.

Thus, in our view, Mrs. Sinkevich's identification of Appellant's vehicle was not improper. Rather, the risks inherent in identification of inanimate objects go to the weight and sufficiency of the evidence instead of admissibility and were properly submitted to the jury. *See Miller*, 535 N.W.2d at 523; *Inge*, 228 S.E.2d at 567. Therefore, we approve of the Superior Court's holding in *Carter* and agree that "it has never been the case that identification of an object must be subject to the same precautions given the identification of a person" and that any uncertainty in the identification goes to the weight to be afforded to the testimony. 414 A.2d at 373. If the identification of the car was suspect, not positive, or suggestive, the credibility of Mrs. Sinkevich in that regard was properly placed before the jury on cross-examination and during closing argument. To the extent Appellant believes the vehicle identification was unduly suggestive, his counsel had adequate opportunity to elicit evidence in this regard. The jury, not the trial court, is the final arbiter of the reliability of Mrs.

588

Sinkevich's testimony. In sum, we find no trial court error based on Appellant's argument in this regard.

### B. Cross–Examination of Appellant

 Appellant contends that the trial court erred and abused its discretion in allowing the prosecutor to question him about whether he had maintained a different version of events for five months following the Lunario murders, where this information was obtained through confidential communications between Appellant and his prior trial counsel, Attorney Kennedy. A preliminary review of *Chmiel II* and testimony elicited from Appellant at trial is necessary for a complete discussion of Appellant's argument.

After his first conviction, Appellant challenged the effectiveness of Attorney Kennedy. According to Attorney Kennedy's PCHA hearing testimony in 1988 following Appellant's first conviction and sentence, when Appellant first met with him, his first story regarding the night of the murders was that he was at the scene to "case the joint" when he saw a shadow that he thought was Martin. Appellant called out, and the shadow ran down an alley near the Lunario home and got into a car. *Chmiel II*, 738 A.2d at 410. A few months later, Appellant's story to his attorney changed, when he "suddenly remembered he was elsewhere," and Attorney Kennedy was forced "to get out there and structure an alibi with a witness who keeps changing" his story. *Id.* at 411, quoting Attorney Kennedy's testimony. Further, after the preliminary hearing at which Martin testified against him, Appellant maintained that Martin had told him that he had committed the murders with Mr. Buffton.

At his second trial in 1995, Appellant took the stand and asserted that he had not been in the vicinity of the Lunario home on September 20–21, 1983 and that he had "never . . . told anybody anything different." *Chmiel II*, 738 A.2d at 410. On cross-examination, the prosecutor utilized the transcript of Attorney Kennedy's testimony from the 1988 PCHA hearing. The prosecutor asked, and Appellant admitted, that for "a period of five months, starting with a conference with Mr.

Kennedy on October the 5th [1983], that you maintained that you were on the scene at 1:00 o'clock in the morning and you tried to blame your brother because you said your brother was running from the scene." *Id.* On appeal, this Court reversed and held that this questioning, specifically the reference to Attorney Kennedy, violated Appellant's right to the effective assistance of counsel and to freedom from compelled incrimination, and remanded for a third trial with the direction that Attorney Kennedy's testimony "shall not be utilized for any purpose at retrial." *Id.* at 424.[17]

Prior to the third trial, the prosecutor presented a motion seeking permission, if Appellant took the stand, to cross-examine and impeach him with his 1995 testimony in which he indicated that he was at the scene of the Lunario home on the night of the murders and observed a shadow he thought was his brother. Specifically, the prosecutor sought to use the following passage:

Q: Well, isn't it a fact, though, sir, for a period of five months starting with a conference with Mr. Kennedy on October the 5th that you maintained that you were on the scene at 1:00 o'clock in the morning and you tried to blame your brother because you said your brother was running from the scene?

A: Yes.

*Id.* at 410. The prosecutor maintained that if Appellant took the stand and denied making such a statement, he should be able to use this passage by simply redacting the words "starting with a conference with Mr. Kennedy on October 5th" so as to avoid our prohibition in *Chmiel II* of any reference to Attorney Kennedy. Defense counsel countered that regardless of the exclusion of the attorney by name, the excerpt still incorporated discussions with prior counsel and should not be permitted. The trial court agreed with defense counsel that any inquiry regarding communication between Appellant and

17. Justices Castille and Newman dissented and characterized the majority holding as "tantamount to placing this Court's judicial imprimatur on the practice of perjury in the Commonwealth." *Chmiel II* at 426 (Castille and Newman, JJ., dissenting).

590

Attorney Kennedy was inappropriate by virtue of *Chmiel II*, but thought it conceivable that Appellant made comparable representations to other individuals following the murders. Any questioning regarding such statements to third parties would not, the trial court reasoned, be barred. The trial court therefore permitted the prosecutor to question Appellant as to whether, exclusive of any discussions that he may have had with counsel, he maintained during the first five months following the murders that he was at the scene at 1:00 a.m. The trial court would not, however, allow the prosecutor to question Appellant about any discussion with Attorney Kennedy.

At trial the following exchange took place:

Q. Now, isn't it true that you maintained for a period of five months that you were on the scene of that crime at 1:00 o'clock in the morning and you tried to blame Marty because you said that Marty was running from the scene of the crime?

A. I maintained that to whom?

Q. To anybody?

THE COURT: Anyone except, obviously, if you said something to a priest or a doctor, or a lawyer, you know, anything like that would be privileged.

A. No, sir.

Q. Now you know that's a lie, don't you?

A. I know that's a lie that—no.

Q. What you just said is a lie?

A. That I didn't maintain that?

Q. Right.

A. I was never on the scene at 1:00 o'clock in the morning. We're talking about the 20 of September?

Q. Right.

A. I was never there.

Q. But you said you were?

A. I said I was?

Q. Right.

A. No, sir. I never said that to anyone.

N.T., 9/5/02, at 5–6.

▓▓▓ Based on the above testimony elicited at trial and the prohibition in *Chmiel II* of any reference to Attorney Kennedy's PCHA testimony, Appellant submits that although no mention was made of Attorney Kennedy at trial, the trial court's decision to allow this questioning at all was error because there exists no evidence either inside or outside the record that he maintained this information to anyone other than Attorney Kennedy. Similar to the "fruit of the poisonous tree" doctrine,[18] Appellant asserts that the Commonwealth would not have had this question in mind but for the testimony of Attorney Kennedy regarding communications with Appellant. By allowing Appellant's credibility to be attacked with evidence of information that was derived from Attorney Kennedy's testimony, which this Court had already found improper, Appellant avers that the prosecutor was successfully allowed to circumvent the holding of this Court in *Chmiel II* and to attack improperly Appellant's credibility.

The Commonwealth points out that the specific concern of *Chmiel II* was the possible breach of attorney-client privilege. This concern was protected, argues the Commonwealth, because the effect of the questioning was simply to determine whether Appellant had made any non-privileged statements supplying an account of events of September 20, 1983, that differed from the version of events he was presenting at trial. The Commonwealth avers that this was not an abuse of trial court discretion and even if it was error, it was harmless because, as the trial court notes, Appellant was "essentially permitted to testify falsely without consequence." Tr. Ct. Op. at 82.[19]

---

**18.** This doctrine, in the context of Fourth Amendment jurisprudence, requires the exclusion of evidence or confessions obtained as a result of a constitutional violation unless purged by intervening events. *Commonwealth v. DeJesus*, 567 Pa. 415, 787 A.2d 394 (2001).

**19.** Initially, we reject the Commonwealth and trial court's contention that, because of *Chmiel II*, Appellant was permitted to take the stand and lie with impunity. Pursuant to the line of questioning pursued on cross-examination, the prosecutor asked Appellant if he had ever main-

We initially note that cross-examination is the primary method for testing the believability of a witness and the truth of his testimony. *Davis v. Alaska,* 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974). Cross-examination may be employed to test a witness' story, to impeach credibility, and to establish a witness' motive for testifying. *Commonwealth v. Robinson,* 507 Pa. 522, 491 A.2d 107 (1985). The "scope of cross-examination is a matter within the discretion of the trial court and will not be reversed absent an abuse of that discretion." *Commonwealth v. Gibson,* 547 Pa. 71, 688 A.2d 1152, 1167 (1997), *cert. denied,* 522 U.S. 948, 118 S.Ct. 364, 139 L.Ed.2d 284 (1997).

With this standard in mind, we agree with Appellant that it was an abuse of trial court discretion to allow the prosecutor to question Appellant about whether he had ever told anyone that he had been at the Lunario home on the night of the murders because the only source for Appellant's prior statements in this regard were the confidential communications with Attorney Kennedy, revealed as a consequence of Appellant's claim of ineffective assistance of counsel following his first trial. The basis for our holding in *Chmiel II* was the fear that the use of testimony of prior counsel would "have a chilling effect on defendants' exercise of their right to the effective assistance of counsel." 738 A.2d at 423.[20] Accord-

tained to anyone that he had been at the Lunario home on the night of the murders. At that point, the trial court intervened and clarified that the question excluded conversations with "a priest or a doctor, or a lawyer" because "anything like that would be privileged." Tr. Ct. Op. at 79. When Appellant responded in the negative, his answer likewise excluded privileged conversations with Attorney Kennedy. Therefore, it does not appear that *Chmiel II* permitted Appellant "to testify falsely without consequence." Tr. Ct. Op. at 82.

**20.** We explained the reasoning behind the chilling effect that would ensue from the use of confidential communications against a defendant as follows:

Knowing of the possibility that his counsel may ultimately be required to testify against him, a defendant may decide that counsel cannot be trusted with the most damaging information concerning his case; or he may decide not to challenge counsel's effectiveness, fearing that his ability to mount a successful defense at a second trial has been fatally undermined by the admissibility of his communications to prior counsel. The fundamental unfairness of requiring a

ingly, we held that client confidences revealed by an attorney during an ineffectiveness challenge may not subsequently be used against the client:

> [W]e hold that the policy inherent in the legislative recognition and judicial enforcement of the attorney-client privilege, as it implicates a defendant's exercise of the right to the effective assistance of counsel and to freedom from compelled self-incrimination, restricts the use as well as the scope of permitted disclosures. Just as an attorney may not respond to allegations of ineffectiveness by disclosing client confidences unrelated to such allegations, *so the client confidences properly disclosed by an attorney at an ineffectiveness hearing may not be imported into the client's subsequent trial on criminal charges.* The trial court's decision to the contrary in the present case was error.

*Chmiel II,* 738 A.2d at 424 (emphasis added).

▮ Based on *Chmiel II,* Attorney Kennedy's testimony regarding confidential communications with Appellant were not to be imported into Appellant's third trial. The trial court, however, allowed the prosecutor to impeach Appellant with information obtained from this testimony. Although the trial court required the prosecutor to avoid any reference to the attorney, the fact remains that the source of the information was the testimony of Attorney Kennedy, revealed at the PCHA hearing in connection with Appellant's charge of ineffective assistance of counsel. The trial court's effort to sanitize the cross-examination by removing the reference to the attorney was specifically inadequate to comply with the holding of our Court in *Chmiel II,* and Appellant has demonstrated an abuse of discretion in this regard. We are satisfied, however, that the error in this regard was harmless.

▮ Mere error in the abstract is not sufficient to warrant a retrial. *Commonwealth v. Linkowski,* 363 Pa. 420,

---

defendant to choose either of those options is illustrated by the present case: the situation that such a choice seeks to avoid—the admission at a second trial of prior counsel's evidentiary hearing testimony—has occurred precisely because prior counsel was shown to have been ineffective.

*Chmiel II,* 738 A.2d at 423.

70 A.2d 278, 280 (1950); *Commonwealth v. Butts*, 495 Pa. 528, 434 A.2d 1216, 1218 (1981). Even though we find that our holding in *Chmiel II* has been violated, we must conclude that the error was harmless beyond a reasonable doubt. An error will be deemed harmless where the appellate court concludes beyond a reasonable doubt that the error could not have contributed to the verdict. *Commonwealth v. Mitchell*, 576 Pa. 258, 839 A.2d 202, 214 (2003); *Commonwealth v. Rivera*, 565 Pa. 289, 773 A.2d 131, 138 (2001). If there is a reasonable possibility that the error may have contributed to the verdict, it is not harmless. *Mitchell*, 839 A.2d at 214. The burden of establishing that the error was harmless rests upon the Commonwealth. *Commonwealth v. Story*, 476 Pa. 391, 383 A.2d 155, 162 n. 11 (1978); *Commonwealth v. Haight*, 514 Pa. 438, 525 A.2d 1199, 1200 (1987).

As previously noted, harmless error exists in three alternative scenarios: where the error did not prejudice the defendant or the prejudice was *de minimis*, the erroneously admitted evidence was merely cumulative of other untainted evidence which was substantially similar to the erroneously admitted evidence, or the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict. *Commonwealth v. Smith*, 580 Pa. 392, 861 A.2d 892 (2004), *Commonwealth v. Robinson*, 554 Pa. 293, 721 A.2d 344, 350 (1998). Any of these three findings will support a conclusion of harmless error.

We find that this case clearly falls within the first alternative, leading us to the conclusion that the committed error was harmless. Specifically, the error caused when the prosecutor asked Appellant if he had ever told anyone that he was at the Lunario home on the night of the murders did not prejudice Appellant, or, if it did, such prejudice was *de minimis*. In response to the improper question, Appellant maintained that he had "never said that to anyone." N.T., 9/5/2002, at 6. The line of questioning did not proceed past Appellant's denial, so no harmful evidence was produced. There was no further

exploration of this line of questioning or improper exploitation of Attorney Kennedy's testimony. In fact, Appellant's answer, which was a denial, was the only "evidence" improperly admitted.

Thus, we conclude that the error created by this improper query was harmless because any prejudice to Appellant, if at all, was insignificant and *de minimis*, and could not have contributed to the verdict.

## C. Post–Arrest Statement

Appellant next argues that the trial court erred and abused its discretion by allowing the prosecutor to utilize Appellant's post-arrest, post-*Miranda* statement, which was given prior to his invocation of his right against self-incrimination.

At the time of his arrest, Appellant was properly advised of his rights to remain silent and to legal representation pursuant to *Miranda*, and indicated that he understood those rights. N.T., 8/28/2002, at 169. Trooper Gaetano asked Appellant "where were you last Tuesday night," and Appellant answered that he was home watching television with his wife. *Id.* at 173. Upon further questioning regarding his whereabouts, Appellant indicated "I don't think I better talk about that." [21] Dkt. Entry No. 407, at 1.

At trial, the prosecutor moved to introduce evidence of incriminating statements made by Appellant after he had declined to discuss things further, maintaining that Appellant's remark that he better not talk about that did not constitute an assertion of a constitutional right under the standard articulated in *Davis v. United States*, 512 U.S. 452, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994) (holding that if a suspect effectively waives his right to counsel after receiving *Miranda* warnings, law enforcement officers are free to question him, but if the

21. Appellant was arrested on September 28, 1983, a Wednesday. Appellant avers that Trooper Gaetano first asked him where he was "last Tuesday," which he interpreted to mean September 27, 1983, and responded that he was home watching television with his wife. Appellant maintains that Trooper Gaetano then asked him where he was on the previous Tuesday night, meaning September 20, 1983, at which point he invoked his right to remain silent.

suspect requests counsel at any time during the interview, he is not subject to further questioning until a lawyer has been made available or the suspect himself reinitiates conversation). The trial court rejected the prosecutor's motion and restricted him to introducing into evidence only those statements that Appellant made to Trooper Gaetano after his waiver of his constitutional rights but before his statement terminating the discussion.

Accordingly, Trooper Gaetano testified as follows:

Q. After the defendant was warned [of his *Miranda* rights] did you ask him if he would answer some questions?

A. Yes, in the state police cruiser I was sitting in the back seat with him. And I asked if he would mind answering some questions for me.

Q. What was his response?

A. Sure, why not.

Q. Did you ask him the following question, 'where were you last Tuesday night?'

A. Yes, I did.

Q. What was his answer?

A. Home watching television with my wife.

N.T., 8/28/2002, at 173. On cross-examination, Trooper Gaetano was questioned about the possibility that Appellant assumed that Trooper Gaetano was referring to Tuesday September 27 instead of Tuesday September 21 when he was asked where he had been "last Tuesday night." N.T., 8/29/2002, at 116–19. Trooper Gaetano admitted that when Appellant answered that he was home with his wife, Trooper Gaetano did not know to which Tuesday he was referring. *Id.* at 120. Based on this testimony, the jury could have been led to believe that Appellant had answered concerning his whereabouts on September 27, 1983, instead of September 20, 1983. The prosecutor, therefore, sought to introduce the subsequent line of questioning in which Trooper Gaetano asked another question to allow Appellant to clarify his answer for Tuesday, September 20, 1983 (at which point Appellant invoked his right to remain silent). In sustaining the defense objection, the trial court barred further questioning.

Appellant avers that he was prejudiced by the admission of his statement to Trooper Gaetano because he was unable to respond adequately to the confusion caused by the question. To respond adequately, Appellant argues that he would have faced compulsion to disclose to the jury that he had exercised his right against self-incrimination. Appellant argues that the unfair prejudice caused by his inability to respond fairly to the question and explain his confusion without waiving a constitutionally protected right outweighed the probative value of the post-*Miranda*, pre-exercise statement and the trial court erred in failing to preclude all of Appellant's post-arrest statements. *See* Pa.R.E. 403 ("Although relevant, evidence may be excluded if its probative value is outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."). Therefore, it appears that despite the fact that the trial court ruled in Appellant's favor on the issue of his post-arrest statement, Appellant maintains that he was prejudiced by the testimony relating to this statement. We disagree.

 Appellant sought and won a prohibition of any reference to statements made *after* he invoked his rights. He cannot now challenge that ruling on the basis that he was somehow prejudiced by it. A party in a criminal proceeding cannot argue for a specific ruling and then, after obtaining a favorable ruling, claim that the trial judge committed an error of law in making it. *See Commonwealth v. Hayes,* 755 A.2d 27 (Pa.Super.2000). Appellant had the opportunity to clarify the matter through the cross-examination of Trooper Gaetano and it was not an abuse of discretion to permit Appellant's post-Miranda statement, made prior to his invocation of the right to remain silent because the statement was relevant, was not prejudicial, and did not violate any constitutional right.

### D. Financial Arrangement

 Appellant next argues that the trial court erred and abused its discretion when it allowed his former attorney, who

represented him on an unrelated charge, to testify about their fee agreement in violation of the attorney-client privilege. This attorney, Attorney Brier, had represented Appellant on the rape charges. It was central to the Commonwealth's case that Appellant's motive for the Lunario burglary was to obtain "fast money" to pay Attorney Brier. To this end, the prosecutor introduced Martin's testimony that Appellant's debt to Attorney Brier was the impetus for the crime. Appellant attempted to refute this theory by testifying that Attorney Brier had quoted him a fee of $5000, which Appellant had partially paid. Thus, Appellant attempted to demonstrate that there was no urgency for him to acquire money. Over defense objection, the prosecutor called Attorney Brier to the stand to give his version of the fee arrangement with Appellant. Attorney Brier testified that Appellant retained him in the spring of 1983 "to represent him in a legal matter" for which his fee was $10,000, not $5000, of which $7000 remained due and unpaid. N.T., 9/5/2002, at 163. Appellant asserts that this testimony violated the attorney-client privilege and that he never waived this privilege. Appellant argues he was prejudiced by this testimony because it misled and confused the jury. In this regard, Appellant argues that other than Martin's statement that Appellant needed "fast money," there was no connection between Attorney Brier's testimony and the murder of the Lunarios and the testimony's purpose was merely to sow confusion. As evidence of this purpose, Appellant notes that there was no link between Attorney Brier's representation and the murders because the attorney remained unpaid even after the murders.

 "The attorney-client privilege has been a part of Pennsylvania law since the founding of the Pennsylvania colony, and has been codified in our statutory law." *In re Estate of Wood*, 818 A.2d 568, 571 (Pa.Super.2003). The relevant provision states that "[i]n a criminal proceeding counsel shall not be competent or permitted to testify to confidential communications made to him by his client, nor shall the client be

compelled to disclose the same, unless in either case this privilege is waived upon the trial by the client." 42 Pa.C.S. § 5916. While the attorney-client privilege is statutorily mandated, it has a number of requirements that must be satisfied in order to trigger its protections. First and foremost is the rule that the privilege applies only to confidential communications made by the client to the attorney in connection with the provision of legal services. *Slater v. Rimar, Inc.*, 462 Pa. 138, 338 A.2d 584, 589 (1975).

We agree with the trial court that disclosure of a fee arrangement between an attorney and client does not reveal a confidential communication. *See Montgomery County v. MicroVote Corp.*, 175 F.3d 296, 304 (3d Cir.1999) (holding that a fee agreement letter is not privileged); *In re Grand Jury Investigation*, 631 F.2d 17, 19 (3d Cir.1980) (holding attorney-client privilege does not protect fee arrangements absent strong probability that disclosure would implicate client in criminal activity for which client sought legal advice); *Slusaw v. Hoffman*, 861 A.2d 269, 272–73 (Pa.Super.2004) (holding that production of evidence from attorneys regarding meetings and telephone calls would not violate attorney-client privilege where it would not call for disclosure of confidential communications). Because the testimony regarding the fee agreement in this case does not disclose strategy or otherwise divulge confidential information, it is not subject to the attorney-client privilege. Appellant has not demonstrated an abuse of trial court discretion in allowing Attorney Brier's testimony. Moreover, it was certainly relevant that Appellant had a sizeable outstanding debt. Appellant's attempt to negate the relevance by emphasizing the fact that his attorney remained unpaid after the murders is unpersuasive: whether he actually gave the proceeds of the crime to his attorney is immaterial. The fact remains that his debt was a possible motive for the crime. In sum, we find no trial court error in this regard.

### E. Trooper Gaetano's Testimony

In his last claim of improperly admitted evidence, Appellant claims that the trial court erred in permitting, in

part, Trooper Gaetano's testimony because it was hearsay. The prosecutor offered Trooper Gaetano to testify about the course of the homicide investigation and how the investigation came to focus on Appellant. Defense counsel objected on hearsay grounds, but the trial court allowed the testimony to show the "course of conduct" of the investigation and issued the following cautionary instruction to the jury:

> There are exceptions to the hearsay rule, one of which deals with police officers.
>
> A hypothetical we provide sometimes is that if a police officer is driving down the street and has someone run up to his car and say 'a six foot five red-headed guy just robbed that gas station and drove away in a green car,' now the police officer takes off looking for a six foot five red-headed guy driving a green car ... it's not being offered to establish that the witness had actually said that. It's being offered to explain why this police officer upon receipt of this information now goes out looking for a green car being driven by a red-headed man. That same principle would apply here, and that is that [Trooper Gaetano] is testifying as to why upon receipt of certain information one individual was ruled out and the investigation focused on another individual. It's being offered for that limited purpose.

N.T., 8/28/2002, at 158–59.

Hearsay is an out-of-court statement offered to prove the truth of the matter asserted in the statement. *Commonwealth v. Puksar*, 559 Pa. 358, 740 A.2d 219, 225 (1999). The rule against admitting hearsay evidence stems from its presumed unreliability, because the declarant cannot be challenged regarding the accuracy of the statement. *Commonwealth v. Rush*, 529 Pa. 498, 605 A.2d 792, 795 (1992). But it is well established that certain out-of-court statements offered to explain the course of police conduct are admissible because they are offered not for the truth of the matters asserted but rather to show the information upon which police acted. *Commonwealth v. Jones*, 540 Pa. 442, 658 A.2d 746, 751 (1995); *Commonwealth v. Yates*, 531 Pa. 373, 613 A.2d 542, 543 (1992); *Commonwealth v. Palsa*, 521 Pa. 113, 555

A.2d 808, 810 (1989); *Commonwealth v. Cruz*, 489 Pa. 559, 414 A.2d 1032, 1035 (1980). The trial court, in exercising discretion over the admission of such statements, must balance the prosecution's need for the statements against any prejudice arising therefrom. *See Jones*, 658 A.2d at 751; *Yates*, 613 A.2d at 543–44; *Palsa*, 555 A.2d at 811.

Appellant argues that the course of conduct leading up to his arrest is irrelevant or has little probative value, and the trial court should not have admitted it because of the danger that the jury would consider it for its truth. He avers that the sole purpose for the presentation of the testimony was not to prove course of conduct, but rather to allow Trooper Gaetano to confirm and bolster Martin's statement to police regarding Appellant's confession. In support of his argument, Appellant relies on *Palsa*, in which this Court held that not every out-of-court statement having bearing upon subsequent police conduct should be admitted because, despite cautionary instructions, there is great risk that certain types of statements will be considered by the jury as substantive evidence of guilt. *Id.* at 810. We therefore held that the statement of an individual identifying defendant as the buyer of marijuana was inadmissible to explain subsequent police conduct. *Id.* We noted the need for weighing the dangers of hearsay testimony against the need for evidence to explain why police pursued a given course of action, and found that this balancing process lies in the sound discretion of the trial court, which will be upheld on appeal unless there has been an abuse of discretion. *Id.* at 811. Appellant contends that here, as in *Palsa*, the "statements go beyond what is reasonably necessary to explain police conduct," and the boundary within which such evidence is admissible was exceeded. *Id.* We disagree.

We find this case factually similar to *Jones*, 658 A.2d at 749. In *Jones*, defendant had attacked the adequacy of the investigation, alleging that police ignored facts and evidence and failed to interview adequately potential witnesses. *Id.* at 751. Because of this attack, we found admissible a police officer's testimony that provided the jury with a complete picture of the police investigation. The testimony provided the jury with

all of the rumors and leads that police pursued, and chronologically related the progress of the investigation to information received from various individuals, including a testifying witness. We found that this testimony was offered not to show the truth of the matters stated but to explain police conduct. *Id.* at 751. Further, we found this testimony proper because it merely repeated matters covered in the witness' own testimony. *Id.* Hence, it was not a case where statements made by a third party who did not testify were introduced indirectly through the police testimony.

A review of the testimony reveals that Trooper Gaetano referred to statements he had taken from Martin and recounted the steps taken in the investigation and the information that accumulated. The nature of the testimony was limited to the course of conduct because it provided the jury with a complete picture of the investigation and did not go beyond what was reasonably necessary to explain this conduct. We agree with the trial court that the course-of-conduct testimony was particularly appropriate because defense counsel had attacked the adequacy of the police investigation and its focus upon Appellant rather than Martin and/or Mr. Buffton. *See Jones,* 658 A.2d at 751. Appellant's challenge to the competency of the investigation opened the door for the prosecution to provide extensive testimony explaining the course of the investigation. Further, although Appellant focuses on Trooper Gaetano's description of Martin's statements to police regarding what Appellant told Martin, we believe that because Martin also testified about his conversation with Appellant and his reiteration of this conversation to police, this case, like *Jones,* is not a case where the out-of-court statement was made by a party that did not testify. N.T., 8/26/2002, at 30–40; *see Jones,* 658 A.2d at 751. Trooper Gaetano's testimony regarding the course of the investigation was properly admitted. Especially in light of the cautionary instruction, the trial court did not abuse its discretion in permitting this testimony. *See Commonwealth v. Stokes,* 576 Pa. 299, 839 A.2d 226, 230 (2003) ("A jury is presumed to follow the court's instructions.").

## IV. Preclusion of Evidence

Appellant argues that the trial court improperly precluded defense counsel from questioning Martin regarding a burglary that he previously admitted committing with Mr. Buffton, for which he was never convicted.[22] Appellant sought to question Martin and Mr. Buffton regarding their participation in this burglary, arguing that the other burglary demonstrated that both men were capable of committing the instant crime. The trial court denied this request because neither Martin nor Mr. Buffton had ever been convicted of this offense. Appellant now argues that the purpose for the presentation of the prior burglary was four-fold: first, to demonstrate that Martin and Mr. Buffton had the motive, intent, preparation, plan, and knowledge for committing a burglary because they had engaged in the prior burglary together; second, to call into question the credibility of Martin and Mr. Buffton to the extent that they had engaged in criminal activity before; third, to establish that nether had been charged with this prior crime; fourth, to show Mr. Buffton's propensity to deny criminal culpability even when Martin admitted it.

We find no error in the trial court's exclusion of this evidence. The admission of prior bad acts is within the discretion of the trial court and will only be reversed upon a showing of abuse of discretion. *Commonwealth v. Simmons,* 541 Pa. 211, 662 A.2d 621 (1995). It is a long-standing principle in this Commonwealth that evidence of a distinct crime, except under special circumstances, is inadmissible. *Commonwealth v. Morris,* 493 Pa. 164, 425 A.2d 715, 720 (1981). Permissible use of evidence of other crimes is addressed in Pa.R.E. 404(b), which states, "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity there-

---

**22.** Prior to Appellant's first trial, Martin testified at a preliminary hearing that he had advised Mr. Buffton of the presence of money in a home in West Scranton. After Martin gave Mr. Buffton the address of the home, Mr. Buffton burglarized it and gave Martin $40. Mr. Buffton denied involvement in this burglary. Neither Martin nor Mr. Buffton were charged or convicted of this burglary.

with" but "[e]vidence of other crimes, wrongs, or acts may be admitted for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident." Additionally, the veracity of a witness may not be impeached by prior arrests which have not led to convictions. *Commonwealth v. Katchmer*, 453 Pa. 461, 309 A.2d 591, 593 (1973); *Commonwealth v. Jackson*, 475 Pa. 604, 381 A.2d 438, 439 (1977).[23] Pa.R.E. 608(b) precludes the admission of specific instances of misconduct to attack a witness' character for truthfulness while Pa.R.E. 609(a) requires an actual conviction of a crime involving dishonesty or false statement in order for a witness's credibility to be attacked with evidence of the crime. Because there was no conviction, admission of this evidence was properly barred to challenge the credibility of the witness.

Moreover, the comment to Rule 404 allows the introduction of other crimes or wrongs to prove motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident only if their probative value outweighs the potential prejudice. Pa.R.E. 404, cmt; *Morris*, 425 A.2d 715. Here, the trial court allowed the defense to impeach Martin and Mr. Buffton under Pa.R.E. 608(b) with evidence of their 1985 convictions for arson-related offenses, thus affording the defense ample opportunity to attack the witnesses' credibility.

Appellant does not demonstrate how evidence of this other burglary would fall within the permissible uses of prior bad acts under Rule 404(b)(2), although in his post-sentence motion he argued that the burglary evidence would have "shown both these two individuals had the motive, intent, preparation, plan and knowledge of doing a burglary since they both did a similar burglary a short time earlier." Dkt. Entry No. 480, at 32. Based on this argument, Appellant sought to introduce

23. The rationale for this rule has been repeatedly stated as follows: "[T]here is a vast difference between a conviction and a mere accusation. An inquiry as to a mere arrest or indictment is not permitted because an arrest or an indictment does not establish guilt, and the reception of such evidence would merely constitute the reception of somebody's hearsay assertion of the witness' guilt." *Katchmer*, 309 A.2d at 593; 3 Wigmore, Evidence § 980(a) (Chadbourn rev.1970).

this evidence to "show an action in conformity therewith," a purpose expressly prohibited by Pa.R.E. 404(b)(1). It was within the trial court's discretion to determine that the probative value of the uncharged burglary was outweighed by the potential for unfair prejudice, confusion of the issues, or misleading the jury. The trial court properly excluded it.

## V. Penalty Phase

### A. *Simmons* Charge

Citing the United States Supreme Court decision in *Simmons v. South Carolina,* 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994), Appellant contends that the trial court erred in refusing to include, in its charge to the jury at the penalty phase, an instruction that Appellant would be ineligible for parole if he should be sentenced to life imprisonment.[24] A defendant is entitled to such an instruction upon request where the prosecution has placed his future dangerousness at issue. *See Commonwealth v. Spotz,* 563 Pa. 269, 759 A.2d 1280, 1291 (2000). Appellant argues that the Commonwealth placed his future dangerousness at issue through its penalty-phase argument.

In anticipation of the penalty phase, Appellant filed a motion *in limine* seeking to bar the prosecutor from arguing his future dangerousness. Relying on *Commonwealth v. Trivigno,* 561 Pa. 232, 750 A.2d 243 (2000) (Opinion Announcing the Judgment of the Court), the trial court concluded that the prosecution was entitled to argue Appellant's future dangerousness subject to a jury instruction pursuant to *Simmons.*[25]

**24.** A *Simmons,* or "life means life," instruction, directs the jury that a sentence of life imprisonment does not permit parole. *Simmons,* 512 U.S. 154, 114 S.Ct. 2187.

**25.** In *Trivigno,* the lead Opinion stated:

We now hold that when a *Simmons* instruction is required because the prosecution has argued the defendant's future dangerousness, the trial court ... should inform the jury that a life sentence means that a defendant is not eligible for parole, but that the Governor has the power to grant a commutation of a sentence of life or death if based on the recommendation of the Board of Pardons following a public hearing. Further, the trial court should relay any available statistical

After the penalty phase, the trial court declined to provide a *Simmons* instruction because it found that the Commonwealth intentionally avoided referring to Appellant's future dangerousness and Appellant did not specifically request a *Simmons* instruction. After the jury was charged but before deliberations, the trial court asked the prosecutor and defense counsel whether they had any objections, additions, or corrections concerning the charge, and both indicated that they did not. On the second day of deliberations, the jury asked to be recharged on relevant criteria under the death penalty statute. Defense counsel then requested a *Simmons* instruction, which the trial court denied because the Commonwealth had specifically avoided the issue of Appellant's future dangerousness. Consequently, no *Simmons* instruction was provided to the jury.

Because Appellant did not object to the absence of a *Simmons* instruction at the time the jury was first charged, the trial court found and the Commonwealth argues that he has waived any issue with regard to the court's instructions. *See Commonwealth v. Dougherty*, 580 Pa. 183, 860 A.2d 31, 38 (2004) ("In the absence of a contemporaneous objection, this claim is not subject to review"). Despite finding waiver, the trial court also found that the prosecutor did not raise the issue of Appellant's future dangerousness.

Several reasons militate against finding waiver. First, Appellant preserved the issue for appeal by raising it in a motion *in limine* prior to the penalty phase. Second, when defense counsel raised the issue on the second day of deliberations and requested a *Simmons* instruction, the prosecutor failed to argue that he waived the issue by not raising it prior to deliberations. Finally, and most compellingly, in response to defense counsel's *Simmons* request on the second day of deliberations, the trial court replied "I'll deny that request, but you've preserved that issue by making that request." N.T., 9/10/2002, at 5. Nevertheless, we agree with the trial

information relating to the percentage of life sentences that have been commuted within the last several years.

*Trivigno*, 750 A.2d at 255–56.

court that a *Simmons* instruction was not warranted based on the prosecutor's arguments.

It is undisputed that the prosecutor never used the words "future dangerousness." As we have recognized, however, "[t]he absence of a precise phrase simply cannot overcome the effect of [a] prosecutor's statements," if that effect was to inject the issue of future dangerousness into the jury's deliberations in the penalty phase. *Commonwealth v. Chandler*, 554 Pa. 401, 721 A.2d 1040, 1046 (1998). In this regard, "[a] jury hearing evidence of a defendant's demonstrated propensity for violence reasonably will conclude that he presents a risk of violent behavior, whether locked up or free...." *Kelly v. South Carolina*, 534 U.S. 246, 253–54, 122 S.Ct. 726, 151 L.Ed.2d 670 (2002). "Evidence of dangerous 'character' may show 'characteristic' future dangerousness ..." *Id.* at 254, 122 S.Ct. 726.

During the penalty phase, the prosecutor argued that "certain killers are just so beyond the realm, so out of bounds that there's only one solution-and that solution is death." N.T., 9/9/2002, at 116–17. When discussing the idea that Appellant did not have to kill three people in order to obtain money, the prosecutor argued that Appellant "thirsted after the bliss of the knife." N.T., 9/9/2002, at 122–23. The prosecutor also described Appellant as "abysmal," "deprav[ed]," and "cold[ ] of heart," which, Appellant argues, asked the jury to infer his future dangerousness as these aspects were asserted as part of Appellant's character.

The Commonwealth asserts that the prosecutor was careful not to broach the issue of Appellant's future dangerousness, intentionally avoiding any mention of the subject. When considered in context, the Commonwealth argues that the words and passages pointed out by Appellant do not portray him as an ongoing danger to the public and were within the bounds of oratorical flare. The prosecutor's actions, argues the Commonwealth, merely served to demonstrate that the three murders fell within the category of death penalty-appropriate crimes. We agree.

"During the sentencing phase of a capital case, a prosecutor must be afforded reasonable latitude in arguing his position to the jury and he may employ oratorical flair in arguing in favor of the death penalty." *Stokes*, 839 A.2d at 231–32 (internal citations omitted). "[A]t the penalty phase, where the presumption of innocence is no longer applicable, the prosecutor is permitted even greater latitude in presenting argument." *Commonwealth v. Washington*, 549 Pa. 12, 700 A.2d 400, 414 (1997). Moreover, in order to evaluate whether the comments were improper, we must look at the context in which they were made. *Commonwealth v. Jones*, 542 Pa. 464, 668 A.2d 491, 514 (1995), *cert. denied*, 519 U.S. 826, 117 S.Ct. 89, 136 L.Ed.2d 45 (1996). We note that this is a relatively stringent standard against which Appellant must labor. *Commonwealth v. Hall*, 549 Pa. 269, 701 A.2d 190, 198 (1997); *Commonwealth v. LaCava*, 542 Pa. 160, 666 A.2d 221, 231(1995).

In analyzing the prosecutor's comments to determine whether they implicated future dangerousness, we are guided by the Supreme Court decision in *Kelly*, 534 U.S. 246, 122 S.Ct. 726, 151 L.Ed.2d 670. There, the Supreme Court found that future dangerousness was implicated when the prosecutor expressed his hope that the jury would "never in [their] lives again have to experience ... [b]eing some thirty feet away from such a person as" Kelly. *Id.* at 255, 122 S.Ct. 726. Further, the prosecutor compared Kelly "to a notorious serial killer, variously calling him a 'dangerous' 'bloody' 'butcher.' " *Id.* The Supreme Court found that the prosecutor's characterizations of butchery were arguments of future dangerousness, especially when analyzed in the context of the prosecutor's submissions that Kelly was "more frightening than a serial killer" and that "murderers will be murderers." *Id.*

Unlike *Simmons* and *Kelly*, the jury here was not invited to infer "that petitioner is a vicious predator who would pose a continuing threat to the community." *Kelly,* 534 U.S. at 256, 122 S.Ct. 726, *quoting Simmons,* 512 U.S. at 176, 114 S.Ct. 2187 (O'Connor, J., concurring in judgment). A thorough review of the record demonstrates that the state-

ments in question were limited to the considerations involved in determining whether the death sentence was the appropriate punishment for murdering the Lunario siblings. For instance, the prosecutor noted that the death penalty statute was "written for and because of people like that defendant (indicating), people who have absolutely forfeited their right to remain among us, the people by actions that are just so violent and so despicable and so abysmal that they forfeit their right to life." N.T., 9/9/02, at 116. He then described Appellant's actions to demonstrate that the three murders constituted death-penalty appropriate crimes, specifically stating that Victor's murder demonstrates "that coldness of heart, the type of depravity that tells you that he deserves death." These statements, viewed in context, were proper commentary on Appellant's crimes as an appropriate predicate for the death penalty. "There is nothing improper in the prosecutor arguing the appropriateness of the death penalty because that is the only issue before the jury at the penalty phase of the trial." *Stokes*, 839 A.2d at 233 (quoting *Commonwealth v. Dennis*, 552 Pa. 331, 715 A.2d 404, 415 (1998)).

Here, unlike in Kelly, the prosecutor's closing argument focused exclusively on the facts surrounding the murder of the Lunario siblings and did not speculate about characteristics inherent in Appellant that implied future dangerousness. The part of the argument where the prosecutor referred to the "bliss of the knife" speaks in the past tense, focusing on the motive for the murder, and did not draw conclusions about Appellant's inherent characteristics:

> Was it for money? Think about the weight. Did he have to kill those old people, sick, defenseless old people some? Did he have to kill them? Did he have to stab them 10, 11, 12 times? What weight do you give that? He needed money. He couldn't steal a car? He couldn't stick up a convenience store? He had to go in and butcher three old people? What weight is added by that? Or did he kill because he enjoyed killing?

> When I was getting ready for this case and before we came up here I was reading a book and, obviously, I was

well into this case by that point in time, and I read something in a book that was quoting another book that I thought this is so appropriate I've got to write it down. And what I wrote and what I read was: Thus speaks the judge. Why did this criminal murder? He wanted to rob, but I say unto you he so wanted blood, not robbery. He thirsted after the bliss of the knife. When you think what weight to give that aggravating circumstance, think. If he wanted money, why, why did he have to kill three people?

Thus, in contrast to *Kelly*, the prosecutor did not discuss any propensity for violence. *See Kelly*, 534 U.S. at 254–55, 122 S.Ct. 726. Viewed in the context of the entire argument, these comments were "nothing more than oratorical flair; the prosecutor summarized the evidence of Appellant's criminal acts and argued, from that evidence, that the jury should impose a death sentence." *See Commonwealth v. Williams*, 581 Pa. 57, 863 A.2d 505, 522 (2004).

Further, Appellant takes issue with the prosecutor's comments regarding the evidence submitted to support the history of prior convictions as an aggravating circumstance, specifically the description of the violent nature of the prior rape Appellant committed. We disagree with Appellant that the prosecutor's arguments in support of finding aggravating circumstances implicated Appellant's future dangerousness. This Court has recognized consistently that evidence regarding a defendant's past violent convictions or conduct does not implicate the issue of his or her future dangerousness. *Commonwealth v. Champney*, 574 Pa. 435, 832 A.2d 403, 417 (2003), *cert. denied*, 542 U.S. 939, 124 S.Ct. 2906, 159 L.Ed.2d 816 (2004); *Commonwealth v. May*, 551 Pa. 286, 710 A.2d 44, 47 (1998), *cert. denied*, 525 U.S. 1078, 119 S.Ct. 818, 142 L.Ed.2d 676 (1999). The prosecutor's argument in this case was insufficient to place appellant's future dangerousness at issue. *See Commonwealth v. Rompilla*, 554 Pa. 378, 721 A.2d 786, 795 (1998) (finding future dangerousness not at issue when Commonwealth argued aggravating circumstance that appellant had significant history of felony convictions involving use or threat of force), *overruled on other grounds by, Rom-*

*pilla v. Beard,* 545 U.S. 374, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005); *see also Commonwealth v. King,* 554 Pa. 331, 721 A.2d 763, 778 (1998), *cert. denied,* 528 U.S. 1119, 120 S.Ct. 942, 145 L.Ed.2d 819 (2000); *May,* 710 A.2d at 47. Therefore, because the Commonwealth's argument did not implicate Appellant's future dangerousness, a *Simmons* instruction was not warranted. *Commonwealth v. Fletcher,* 580 Pa. 403, 861 A.2d 898, 913 (2004).

### B. Assistant District Attorney William Fisher's Testimony

██ In his second penalty phase argument, Appellant asserts that the trial court erred in allowing the testimony of Assistant District Attorney William Fisher (ADA Fisher) regarding Appellant's prior rape conviction as such testimony was hearsay, inflammatory, and prejudicial. The Commonwealth sought the testimony of ADA Fisher, who prosecuted Appellant for rape, to support a finding of the aggravating circumstance that "the defendant has a significant history of felony convictions involving the use or threat of violence to the person." 42 Pa.C.S. § 9711(d)(9). Defense counsel filed a motion *in limine* to bar evidence of this prior conviction, including testimony by ADA Fisher. After reviewing the testimony provided by ADA Fisher at Appellant's 1995 murder trial, the trial court denied the motion *in limine.* Because the rape victim and her father, who had also testified at the 1995 trial, were deceased by the time of the 2002 trial, the trial court reasoned that the only evidence that could be presented by the Commonwealth with respect to the facts surrounding the rape conviction was ADA Fisher's testimony.

ADA Fisher testified that while the rape victim was driving home from work after midnight Appellant forced her off the road into an embankment. Once the victim exited her vehicle, Appellant punched her in the face and disrobed her. After he was unable to vaginally or anally rape her, Appellant further beat the victim and directed her to perform oral sex on him. The victim protested that her teeth were loose from the beating, and Appellant forced her to pull her tooth out and perform oral sex on him. The victim complied. ADA Fisher

testified that after the rape Appellant forced the victim into her car, and told her he was going to retrieve his gun from his pick-up truck and that the last thing she would see was the bullet coming out of her head. As Appellant walked to his truck, the victim jumped out of her car and flagged down a passing motorist, who stopped to help her. N.T., 9/9/2002, at 26–28.

■ A death sentence will only be reversed if the jury relied on an unsupported and, therefore, improper aggravating circumstance in rendering its penalty phase verdict. *Jones*, 668 A.2d at 519; *Commonwealth v. Williams*, 537 Pa. 1, 640 A.2d 1251, 1263 (1994). Regardless of whether ADA Fisher's testimony was hearsay, inflammatory, or prejudicial, we find that Appellant is not entitled to relief on this claim because any error in that regard was clearly harmless. Despite ADA Fisher's testimony, the jury did not find as an aggravating circumstance that Appellant had a significant history of felony convictions involving the use or threat of violence. *See* 42 Pa.C.S. § 9711(d)(9). To the contrary, the jury found as a mitigating circumstance that Appellant had no significant history of prior criminal convictions. *See* 42 Pa.C.S. § 9711(e)(1) ("Mitigating circumstances shall include the following: (1) The defendant has no significant history of prior criminal convictions . . . .") Therefore, Appellant cannot demonstrate that he was prejudiced by any alleged error relating to this testimony. *Commonwealth v. Christy*, 511 Pa. 490, 515 A.2d 832 (1986) (finding that the erroneous admission of evidence pursuant to 42 Pa.C.S. § 9711(d)(9) was not prejudicial because the jury did not find the aggravating factor); *Jones*, 668 A.2d at 520 ("Even if Trooper Ansel's summarization was hearsay, we find that its admission constitutes harmless error since the jury did not find the existence of this aggravating circumstance.").

## VI. Ineffective Assistance of Trial Counsel

Appellant raises six claims of ineffective assistance of counsel. Before we can address the merits of those claims, however, we must first determine whether those claims are ripe for disposition. In *Commonwealth v. Grant*, 572 Pa. 48,

813 A.2d 726 (2002), we held that defendants should reserve claims of ineffective assistance of trial counsel until collateral review proceedings. Shortly thereafter, this Court decided *Commonwealth v. Bomar,* 573 Pa. 426, 826 A.2d 831 (2003), *cert. denied,* 540 U.S. 1115, 124 S.Ct. 1053, 157 L.Ed.2d 906 (2004). Although *Bomar* was a capital case on direct appeal at the time we decided *Grant,* this Court ruled that *Grant* would not apply to *Bomar,* where claims of counsel ineffectiveness "were properly raised and preserved in the trial court." 826 A.2d at 853. We reached this conclusion because, in *Bomar,* appellant raised ineffectiveness claims in post-sentence motions, the trial court conducted a series of evidentiary hearings on the claims raised, and addressed their merits in its opinion. *Id.* at 839, 853–54. Thus, the concerns we articulated in *Grant*—the ability of the defendant to develop his ineffectiveness claims and the ability of the reviewing court to consider them—were not implicated in *Bomar.*

Pursuant to *Bomar,* it is appropriate for us to decide the merits of Appellant's ineffective assistance of counsel claims. After trial, Appellant's new counsel filed an amended post-sentence motion alleging ineffective assistance of trial counsel. The trial court held an evidentiary hearing on the claims and disposed of them in its opinion. Therefore, because there was full consideration of Appellant's ineffectiveness claims below, we deem these claims to be proper pursuant to the narrow exception to the *Grant* rule articulated in *Bomar.* Therefore, we proceed to address Appellant's claims.

 To obtain relief on a claim of ineffective assistance of counsel, Appellant must show that there is merit to the underlying claim; that counsel had no reasonable basis for his course of conduct; and finally, that there is a reasonable probability that but for the act or omission in question, the outcome of the proceeding would have been different.[26] *Commonwealth v. Fletcher,* 561 Pa. 266, 750 A.2d 261, 273–74 (2000); *Commonwealth v. Douglas,* 537 Pa. 588, 645 A.2d 226,

**26.** The three-step test used in Pennsylvania merely subdivides *Strickland's* performance prong into the two requirements of demonstrating merit and the lack of a reasonable basis.

230 (1994); *Commonwealth v. Pierce*, 515 Pa. 153, 527 A.2d 973, 974 (1987). In reviewing any particular claim of ineffectiveness, we need not determine whether the first two prongs of this standard are met if the record shows that Appellant has not met the prejudice prong. *Commonwealth v. Travaglia*, 541 Pa. 108, 661 A.2d 352, 357 (1995), *cert. denied* 516 U.S. 1121, 116 S.Ct. 931, 133 L.Ed.2d 858 (1996). The burden of proving ineffectiveness rests with Appellant. *Commonwealth v. Wilson*, 543 Pa. 429, 672 A.2d 293, 298 (1996). To sustain a claim of ineffectiveness, Appellant must prove that the strategy employed by trial counsel "was so unreasonable that no competent lawyer would have chosen that course of conduct." *Williams*, 640 A.2d at 1265. Trial counsel will not be deemed ineffective for failing to pursue a meritless claim. *Commonwealth v. Pursell*, 555 Pa. 233, 724 A.2d 293, 304 (1999); *Commonwealth v. Rollins*, 525 Pa. 335, 580 A.2d 744, 748 (1990).

With this background in mind, we turn to each of Appellant's claims of ineffective assistance of counsel.

## A. *Kloiber* Instruction

In his first claim, Appellant asserts that trial counsel was ineffective for failing to request a *Kloiber* instruction in regard to the identification of his vehicle by Mrs. Sinkevich. *See Commonwealth v. Kloiber*, 378 Pa. 412, 106 A.2d 820 (1954), *cert. denied*, 348 U.S. 875, 75 S.Ct. 112, 99 L.Ed. 688 (1954). Pursuant to *Kloiber*, where a witness was not in a position to observe the assailant clearly, or had previously failed to identify the defendant, the court must instruct the jury to receive the witness' identification testimony with caution. *Id.* at 826–27; *See Commonwealth v. Young*, 561 Pa. 34, 748 A.2d 166, 181 (1999).

This argument fails because there is no merit to the underlying claim. Appellant has not identified any instance in which a *Kloiber* charge has been found to be applicable to the identification of an inanimate object.[27] Moreover, for the

**27.** As the trial court aptly noted, one trial court has applied *Kloiber* identification principles to a police officer's aerial identification of a

same reasons we rejected Appellant's claim in Section III, A of this opinion, the identification criteria for human suspects are not applicable to witness identification of inanimate objects. Thus, there is no legal basis for applying a *Kloiber* instruction to a vehicle identification, and we agree with the trial court that trial counsel was not ineffective for failing to pursue this meritless claim. *Rollins,* 580 A.2d at 748; *see also Commonwealth v. Bormack,* 827 A.2d 503, 508 (Pa.Super.2003).

## B. Trooper Gaetano's Testimony

In his second claim of ineffectiveness, Appellant avers that trial counsel was ineffective for failing to object to the Trooper Gaetano's testimony on hearsay grounds. As discussed in connection with Appellant's claim of trial court error for allowing Trooper Gaetano's testimony, which Appellant believes was improperly admitted hearsay, trial counsel did, in fact, lodge a hearsay objection to this testimony. N.T., 8/28/2002, at 158. The trial court overruled the objection but provided the jury with a cautionary instruction indicating the limited purpose of the testimony to explain the course of conduct of the police in focusing the investigation on Appellant. Trial counsel cannot be found ineffective for failing to do something that he, in fact, did. Further, as we have already agreed with the trial court that this testimony was properly admitted, Appellant's claim in this regard lacks merit.

## C. Cross–Examination of Julie Chmiel Maconeghy

 Appellant next argues that the prosecutor engaged in prosecutorial misconduct during the examination of Appellant's ex-wife, Julie Chmiel Maconeghy, and that trial counsel was ineffective for failing to object to this examination. In connection with the 1995 murder trial, Mrs. Chmiel Macone-

speeding vehicle from a police helicopter. *See Commonwealth v. La-Paglia,* 22 Pa.D. & C.3d 28, 32–34 (C.P. Chester 1981). The Superior Court, however, overturned this application of *Kloiber. Commonwealth v. Baslick,* 389 Pa.Super. 413, 567 A.2d 671, 673 (1989) ("To the extent the *LaPaglia* decision requires a stricter standard of proof in cases where motor vehicles speeding prosecutions are based upon aerial observation, it is overruled.").

ghy's husband, Mr. Maconeghy, provided a signed statement to the police indicating that Mrs. Chmiel Maconeghy had told him that on the morning of the Lunario murders, Appellant returned home covered in blood and explained that he had been involved in a fight. During the 2002 trial, Mrs. Chmiel Maconeghy testified that when Appellant arrived home on September 21, 1983, she did not observe any blood on him. The prosecutor attempted to impeach her testimony with her husband's signed statement to police from the prior trial, but she explained that the statement she made to her husband had nothing to do with the Lunario murders but were referring to a different night entirely. Defense counsel lodged an objection and requested a sidebar, after which the trial court discontinued the examination.[28] Appellant nevertheless argues that this line of questioning was improper, prejudicial, inadmissible, and amounted to prosecutorial misconduct. Appellant therefore argues trial counsel was ineffective for failing to preclude the testimony. We disagree.

"[P]rosecutorial misconduct does not occur unless the unavoidable effect of the comments at issue was to prejudice the jurors by forming in their minds a fixed bias and hostility toward the defendant, thus impeding their ability to weigh the evidence objectively and render a true verdict." *Commonwealth v. Robinson*, 583 Pa. 358, 371–72, 877 A.2d 433 (2005); *Commonwealth v. Paddy*, 569 Pa. 47, 800 A.2d 294, 316 (2002) (citing *Commonwealth v. Rizzuto*, 566 Pa. 40, 777 A.2d 1069 (2001)). Due to the nature of a criminal trial, both sides must be allowed reasonable latitude in presenting their cases to the jury. *Paddy*, 800 A.2d at 316. Upon Mrs. Chmiel Maconeghy's denial that she observed blood on Appellant on the night of September 21, 1983, the prosecutor attempted to impeach her testimony with reference to her prior inconsistent statement to her husband. It is certainly

---

**28.** At sidebar, defense counsel indicated that Ms. Chmiel Maconeghy had advised him that her statement to her husband did not relate to the Lunario murders but rather pertained to the night of the rape. Defense counsel was afraid that, despite being instructed not to use the word rape during her examination, the witness may inadvertently blurt it out. In response, the prosecutor agreed to terminate the examination.

within the scope of cross-examination to ask the witness if she ever made a statement inconsistent with her testimony in court. *See* Pa.R.E. 613 (impeachment of witness by prior statement).[29] Therefore, the prosecutor's questioning during cross-examination regarding the prior statement, coupled with the fact that this line of questioning ended upon defense counsel's request for a sidebar, caused no prejudice or fixed bias in the minds of the jury, and, thus, did not constitute prosecutorial misconduct.

Because we find no prosecutorial misconduct, we find no ineffectiveness in trial counsel's performance in this regard because the underlying claim lacks merit. To the contrary, trial counsel affirmatively acted to protect Appellant's interest. As reflected in the record, trial counsel objected to impeaching the witness with the prior inconsistent statement and by requesting a sidebar, counsel avoided any mention of the rape. Therefore, counsel's timely objection precipitated the discontinuance of the examination and Appellant's claim of trial counsel ineffectiveness in this regard fails.

### D. Prosecutor's Closing Arguments

Appellant next argues that trial counsel was ineffective for failing to object to or request a cautionary instruction regarding, the prosecutor's closing arguments. Specifically, Appellant faults the closing argument in two respects. First, Appellant avers that the prosecutor improperly commented on evidence not of record. During closing arguments, defense counsel referred to Commonwealth exhibit No. 9, which depicted the Lunarios' kitchen table with a pack of cigarettes on it. Defense counsel referred to prior testimony that Martin smoked "Kool" brand cigarettes and had purchased a pack of these cigarettes sometime during the night of September 21,

---

**29.** Rule 613, entitled "Prior statements of witnesses," provides:

(a) Examining witness concerning prior inconsistent statement. A witness may be examined concerning a prior inconsistent statement made by the witness, whether written or not, and the statement need not be shown or its contents disclosed to the witness at that time, but on request the statement or contents shall be shown or disclosed to opposing counsel.

Pa.R.E. 613.

1983. He urged the jury to examine the name on the cigarettes in the picture, reasoning that they were left at the scene by Martin, which is why he later had to purchase another pack. The prosecutor, during closing arguments, replied that defense was making up their story as they went along and the cigarettes could have belonged to Angelina or Victor.[30] Appellant faults this comment because there is nothing in the record indicating that either Angelina or Victor smoked. In his second claim of improper comments during the prosecutor's closing argument, Appellant argues that the prosecutor improperly vouched for the credibility of witnesses when he characterized defense witnesses as "liars" but claimed that Martin was telling the truth.

As noted, the first prong of the ineffectiveness test is that the underlying claim has merit. *Pierce*, 527 A.2d 973. In the context of prosecutorial misconduct during closing arguments, Appellant must demonstrate that there is merit to the contention that trial counsel should have objected or requested a cautionary instruction due to the prosecutor's misconduct. Appellant can only do so if he can show that the prosecutor was, in fact, engaging in misconduct. Otherwise, there is no merit in the contention of trial counsel ineffectiveness.

 We find there is no basis for relief because there was nothing wrong with the prosecutor's remarks and counsel cannot be faulted for failing to pursue a meritless claim. *See Pursell*, 724 A.2d at 304; *Rollins*, 580 A.2d at 748. In determining whether the prosecutor engaged in misconduct, we must keep in mind that comments made by a prosecutor must be examined within the context of defense counsel's conduct. *Commonwealth v. Hawkins*, 549 Pa. 352, 701 A.2d 492, 503 (1997). It is well settled that the prosecutor may

**30.** Specifically, the prosecutor stated:
Tell me, folks, tell me if you can tell that that's Kool Lights. Do you see how small that thing of cigarettes is? It has nothing to do with the fact that Angelina's a smoker or Victor's a smoker. No. They look at that picture, they see a package of Kool Lights. That's not a package of Kool Lights, it's a package of cigarettes. But that's okay because they're making it up as they go along.
N.T. 9/6/2002 at 141.

fairly respond to points made in the defense closing. *See Trivigno*, 750 A.2d at 249 (plurality) ("A remark by a prosecutor, otherwise improper, may be appropriate if it is in fair response to the argument and comment of defense counsel") (*citing United States v. Robinson*, 485 U.S. 25, 31, 108 S.Ct. 864, 99 L.Ed.2d 23, (1988)); *Commonwealth v. Marrero*, 546 Pa. 596, 687 A.2d 1102, 1109 (1996). Moreover, "prosecutorial misconduct will not be found where comments were based on the evidence or proper inferences therefrom or were only oratorical flair." *Hawkins*, 701 A.2d at 503; *Jones*, 668 A.2d at 514.

Regarding Appellant's claims about the reference to the possibility that the Lunarios smoked, the trial court agreed with Appellant that nothing in the record suggested that the victims smoked. However, the trial court found that Appellant had not identified any prejudice resulting from the comment. We agree with this conclusion. The import of the remark regarding the cigarettes was not a suggestion that the victims smoked but rather was the idea that the jury should not get sidetracked by the defense's inconsequential discussion of who may have smoked. *See Commonwealth v. Keaton*, 556 Pa. 442, 729 A.2d 529, 538–39 (1999) (finding that the prosecutor had made a factual representation that was without support in the record, but further holding that "[a]lthough the prosecutor may have strayed slightly from the evidence of record, [defendant's] claim that this remark entitles him to a new trial is meritless"). We fail to see how this remark had the unavoidable effect of prejudicing the jurors to such a degree as to cause them to form a fixed bias and hostility toward the defendant and prevent them from weighing the evidence objectively. *See Rizzuto*, 777 A.2d at 1087; *Keaton*, 729 A.2d at 538.

Further, with regard to trial counsel's reasonable basis for not objecting to these statements, trial counsel testified during the evidentiary hearing on post-sentence motions that they did not object because "the syntax of that [statement] caught [him] off guard," because it was a passing reference in the middle of a separate argument and did not immediately sound

objectionable. N.T., 6/12/2003 Vol. II, at 53–54. Because the jury would have an opportunity to examine the photograph with a magnifying glass, trial counsel also believed that the jurors would "find out that we were right, that it was a pack of Kool Lights," and that the prosecutor's closing argument would backfire.

Regarding Appellant's claims that the prosecutor improperly vouched for the credibility of Martin while improperly calling defense witnesses liars, we likewise find no merit. It is settled that it is improper for a prosecutor to express a personal belief as to the credibility of the defendant or other witnesses. *Commonwealth v. Koehler*, 558 Pa. 334, 737 A.2d 225 (1999). However, the prosecutor may comment on the credibility of witnesses. *Commonwealth v. Jones*, 571 Pa. 112, 811 A.2d 994, 1006 (2002); *Commonwealth v. Simmons*, 541 Pa. 211, 662 A.2d 621, 639 (1995). Further, a prosecutor is allowed to respond to defense arguments with logical force and vigor. *Koehler*, 737 A.2d at 240; *Commonwealth v. Brown*, 551 Pa. 465, 711 A.2d 444, 454 (1998). If defense counsel has attacked the credibility of witnesses in closing, the prosecutor may present argument addressing the witnesses' credibility. *See Commonwealth v. Fisher*, 572 Pa. 105, 813 A.2d 761, 768 (2002) (rejecting defense contention that the prosecutor improperly vouched for the credibility of prosecution witnesses since "[t]he prosecutor was reviewing the testimony of several prosecution witnesses after [defense] counsel had attacked their testimony, in an effort to counter the argument of defense counsel"); *Commonwealth v. Johnson*, 527 Pa. 118, 588 A.2d 1303, 1305 (1991) (holding that a prosecutor's comments stating that a defendant had lied were neither unfair nor prejudicial when given in response to the comments of defense counsel in relation to the credibility of witnesses, and when they were supported by the evidence). A review of the record reveals that this is precisely what occurred in the instant action and, accordingly, this claim warrants no relief.

On numerous occasions during closing arguments defense counsel attacked the credibility of Commonwealth witnesses,

particularly Martin, and characterized them as "liars." N.T., 9/6/2002, at 10, 27–30, 37–38, 52–53, 66. Additionally, defense counsel argued that defense witnesses were being truthful. *Id.* at 92–96, 98–100, 104. Thus, the prosecutor's statements were fair rebuttal. Even if they were an expression of personal opinion, they cannot be characterized as prosecutorial misconduct unless their effect was to "prejudice the jury, forming in their minds fixed bias and hostility toward the defendant so they could not weigh the evidence objectively and render a true verdict." *Robinson,* 877 A.2d 433, 441; *Paddy,* 800 A.2d at 316. We fail to see how the statement had such an effect. Further, regarding trial counsel's reasonable basis for not objecting to these statements, defense counsel testified that they did not object because they did not want to alienate the jury by voicing meritless objections that would be over-ruled. N.T., 6/12/2003, Vol. II at 84–85.

Appellant has not demonstrated that the claims of trial counsel ineffectiveness have merit, or that counsel lacked a reasonable basis for any of the conduct in question. Appellant has failed to argue or demonstrate the reasonable probability that the outcome of the trial would have been different but for the alleged errors. Appellant, therefore, has not overcome the presumption that counsel is effective and these claims fail.

### E. Mitigation

Next, Appellant argues trial counsel ineffectiveness for failing to subpoena Appellant's daughter, Nina, during the penalty phase in support of mitigation arising from Appellant's familial relationships.[31] Nina testified, without subpoena, for her father during the 1995 trial and was "really upset" by the experience. N.T., 6/12/2002 Vol. II, at 30. In anticipation of this trial, counsel met with Nina on more than one occasion to discuss with her the possibility of testifying as a mitigation witness. Before the penalty phase, she indicated that she was willing to testify. *Id.* at 35, 58–59. However, despite making

---

**31.** *See* 42 Pa.C.S. § 9711(e)(8):

Mitigating circumstances shall include the following:
(8) Any other evidence of mitigation concerning the character and record of the defendant and the circumstances of his offense.

arrangements to testify, at the last minute she decided not to testify for Appellant. Based on her testimony at the evidentiary hearing on post-sentence motions, she had thought about it and "didn't want to go through all of that again." Id. at 38. Trial counsel testified to being surprised by this turn of events, and intended to dispatch their private investigator to retrieve Nina so she could testify. Appellant, however, prevented them from doing so, and advised his counsel that he was worried about how his daughter was handling the strain of the trial and did not want to put additional pressure on her. Pursuant to Appellant's wishes, trial counsel did not send the investigator to retrieve Nina.

 Now Appellant points to his daughter's post-trial testimony indicating that if she had been subpoenaed, she would have testified. N.T., 6/12/2003, at 39. To prevail on a claim of trial counsel's ineffectiveness for failure to call a witness, Appellant must prove: "(1) the witness existed; (2) the witness was available; (3) trial counsel was informed of the existence of the witness or should have known of the witness's existence; (4) the witness was prepared to cooperate and would have testified on appellant's behalf; and (5) the absence of the testimony prejudiced appellant." *Bomar*, 826 A.2d at 856. Trial counsel's failure to call a particular witness does not constitute ineffective assistance without some showing that the absent witness' testimony would have been beneficial or helpful in establishing the asserted defense. *See Commonwealth v. Durst*, 522 Pa. 2, 559 A.2d 504, 506 (1989) (citing *Commonwealth v. Peterkin*, 511 Pa. 299, 513 A.2d 373 (1986)). Appellant must demonstrate how the testimony of the uncalled witness would have been beneficial under the circumstances of the case. *See Commonwealth v. Beasley*, 544 Pa. 554, 678 A.2d 773, 778 (1996).

 Based on the transcript of the evidentiary hearing on post-sentence motions, the trial court found that Nina was not ready, willing, and available to testify for her father. Thus, the trial court found that Appellant could not prove the second or fourth prong of the above test. Although Appellant now

argues that counsel should have secured her appearance by subpoena, when counsel attempted to have their investigator retrieve Nina to testify, Appellant instructed them not to do so. *See* Rule Prof. Cond. 1.2(a) (stating that a lawyer shall abide by the client's decisions in a criminal case). We will not find counsel ineffective for acting in conformity with Appellant's instructions. *See Fisher*, 813 A.2d at 771; *Commonwealth v. Marshall*, 571 Pa. 289, 812 A.2d 539, 549 (2002) (counsel was not ineffective for failing to pursue a diminished capacity defense where the defendant insisted that he did not commit the murders and was not guilty). Further, because Nina had indicated her willingness to testify, there was no basis for trial counsel to have her subpoenaed. Accordingly, this claim fails.

### F. Testimony of Dr. Ouligian

Appellant's final ineffective assistance of counsel contention relates to the testimony of Dr. Ouligian, a defense mitigation expert called to provide psychiatric testimony with respect to the effect of Appellant's abusive upbringing upon his emotional development and ability to appreciate the criminality of his violent behavior. In preparing this witness for trial, defense counsel specifically instructed him not to refer to the fact that defendant had twice been convicted and sentenced to death. Nevertheless, during questioning, Dr. Ouligian inexplicably referred to the fact that Appellant had informed him that "he was convicted and sentenced to death twice." N.T., 9/9/2002, at 59–60. Defense counsel promptly interrupted him and asked him another question. Appellant argues that counsel was ineffective for failing to prepare Dr. Ouligian adequately to refrain from mentioning and disclosing the fact that Appellant had been convicted and sentenced to death on two prior occasions or for failing to request a limiting instruction.

Regarding Appellant's argument that counsel inadequately prepared Dr. Ouligian for trial, the uncontested testimony reflects that counsel did, in fact, advise the witness not to mention the prior convictions. For whatever reason, the witness did not comply. Further, regarding trial counsel's

failure to request a limiting instruction, counsel testified to a reasonable basis for this course of conduct. Trial counsel indicated that requesting an instruction would have drawn greater attention to the testimony and unduly emphasized it in the minds of the jury. Further, trial counsel believed that the mitigation testimony may have been afforded less weight by the jury if the court instructed it to disregard part of the testimony due to a motion to strike made by the lawyer who called him as an expert. N.T., 6/12/2003 Vol. I, at 39, 44–45, 49; Vol. II at 79–81. Therefore, we agree with the trial court that the responsive action taken by counsel in interrupting the witness and declining to request a limiting instruction was grounded in a rational trial strategy, and that trial counsel had a reasonable basis for this conduct designed to promote Appellant's interest. Appellant's last claim of trial counsel ineffectiveness fails.

## VII. Review of Death Sentence

Having concluded that Appellant is not entitled to any relief on the claims that he raises and that the evidence is sufficient, we are required by statute to review the imposition of the sentence of death. 42 Pa.C.S. § 9711(h)(1). We are required to affirm the sentence of death unless we determine:

(i) the sentence of death was the product of passion, prejudice or any other arbitrary factor; or

(ii) the evidence fails to support the finding of at least one aggravating circumstance specified in [42 Pa.C.S. § 9711(d) ]

42 Pa.C.S. § 9711(h)(3).

The record discloses no indicia of arbitrariness and does not suggest that the sentence of death was the product of passion, or prejudice. Rather, the sentence was based upon sufficient evidence that Appellant intentionally killed the Lunario siblings. The record indicates that the jury conscientiously balanced the two aggravating circumstances [32] against the two

---

32. The two aggravating circumstances were first, the commission of a murder in the perpetration of a robbery or burglary, *see* 42 Pa.C.S.

mitigating circumstances,[33] and determined that the aggravating circumstances outweighed the mitigating circumstances. Therefore, there is no ground to vacate the sentence pursuant to 42 Pa.C.S. § 9711(h)(3)(i).

Our review of the record supports the jury's finding of the aggravating circumstances that Appellant committed the murder during the perpetration of a felony, specifically robbery or burglary and that Appellant had multiple murder convictions. *See* 42 Pa.C.S. § 9711(d)(6) and (11). Appellant broke into the Lunario home to steal the money that he knew to be hidden throughout the house. While there, he brutally stabbed the three elderly victims resulting in their deaths. Accordingly, we affirm the verdict and the sentence of death.

Appellant's judgment of sentence is affirmed.[34]

Chief Justice CAPPY and Justice CASTILLE join the opinion.

Justice EAKIN did not participate in the decision of this case.

Justice NIGRO files a concurring opinion in which Justice NEWMAN joins.

Justice SAYLOR files a concurring and dissenting opinion.

Justice NIGRO, concurring.

I agree with the majority that Appellant is not entitled to relief but disagree with the majority's analysis as it relates to Appellant's claim that the trial court erred in ruling that the

§ 9711(d)(6) and, second, multiple murder convictions for the murders of the Lunarios, *see* 42 Pa.C.S. § 9711(d)(11).

**33.** The mitigating circumstances found by the jury were first, the absence of a significant history of prior criminal convictions, *see* 42 Pa.C.S. § 9711(e)(1) and, second, "other evidence of mitigation" as a result of his family relationships and abusive upbringing, *see* 42 Pa.C.S. § 9711(e)(8).

**34.** Pursuant to 42 Pa.C.S. § 9711(i), the prothonotary of this court is directed to immediately transmit to the Governor's office the file and complete record of the trial, sentencing hearing, imposition of sentence, and review by the Supreme Court.

prosecutor was allowed to question Appellant about whether his trial testimony regarding the events on the night of the Lunario murders was different from what he had maintained happened on that night for the five months following the murders. In rejecting this claim, the majority concludes that the trial court did indeed err in allowing this questioning, but finds such error to be harmless. I disagree that there was any error on the part of the trial court in the first instance, and therefore see no need to even reach the harmless error question.

As the majority points out, Appellant's prior trial counsel testified at a PCHA hearing that Appellant had changed his story regarding his whereabouts on the night of the murders and subsequently, during Appellant's second trial for the murder charges, the prosecutor used this testimony to challenge Appellant's contention that he had never offered a different version of the events on the night of the murder from the one he was presenting at trial. On appeal, this Court held that this line of questioning—and in particular the prosecutor's reference to Appellant's discussions with his prior attorney—violated Appellant's right to the effective assistance of counsel and to be protected against compelled self-incrimination. *Commonwealth v. Chmiel*, 558 Pa. 478, 738 A.2d 406, 424 (1999) ("*Chmiel II* "). We made clear that this holding was based on the fear that the "use of testimony of prior counsel as in this case would have a chilling effect on defendants' exercise of their right to the effective assistance of counsel." *Id.*

In this case, the prosecutor again sought to question Appellant about whether he had ever maintained a story different from the one he was advancing at trial. Although the trial court concluded that the prosecutor could not reference any communications between Appellant and his prior attorney without violating *Chmiel II*, the court did allow the prosecutor to question Appellant whether, "exclusive of any discussions that he may have had with his counsel," he had ever maintained a version of events on the night of the murders different from the one he had testified to at trial. Trial Ct.

Op. at 79 (quoting Dkt. Entry No. 405, p. 3). The trial court noted the possibility that Appellant "may have told [such a different version to] family, friends or fellow inmates," *id.* at 78, and *Chmiel II* did not, according to the trial court, bar questions about any such statements made to non-privileged third parties.

As the Commonwealth argues here, and I agree, the middle road taken by the trial court in no way violates *Chmiel II,* which was plainly driven by the concern that allowing the Commonwealth to use the content of attorney-client conversations in a subsequent criminal trial would compromise the defendant's right to effective assistance of counsel. By forbidding the prosecutor from referencing any discussions that Appellant had with his prior attorney, the trial court's ruling below very clearly recognized *Chmiel II's* underlying concern, and in my mind effectively removed it from this case. In the end, the trial court's ruling merely allowed the prosecutor to explore whether Appellant had ever told someone, in a non-privileged setting, something about the night of the murders that was different from what he was telling the jury happened on that night. This was, in my view, an entirely proper tool of impeachment.

Thus, unlike the majority, I do not believe that the trial court erred here but because the majority finds such error to be harmless, I am able to join in the result the majority reaches.

Justice NEWMAN joins.

Justice SAYLOR, concurring and dissenting.

I join Parts I and II of the majority opinion, concur in the result with regard to Parts III and IV, and dissent as to penalty.

I respectfully disagree with the majority's analysis, in Part V(A) of its opinion, concerning the range of evidence and argumentation that will implicate a capital defendant's future

dangerousness for purposes of determining the requirement of an instruction concerning the meaning of a life sentence under *Simmons v. South Carolina*, 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994). In *Kelly v. South Carolina*, 534 U.S. 246, 122 S.Ct. 726, 151 L.Ed.2d 670 (2002), the United States Supreme Court set forth the following, straightforward test to determine whether or not future dangerousness is implicated for such purposes:

> Evidence of future dangerousness under *Simmons* is evidence with a tendency to prove dangerousness in the future; its relevance to that point does not disappear merely because it might support other inferences or be described in other terms.

*Id.* at 254, 122 S.Ct. at 732.

Rather than acknowledging and applying this test, the majority undertakes to distinguish *Kelly* on the facts, and proceeds to rely on prior decisions of this Court that are plainly inconsistent with *Kelly*. *Compare* Majority Opinion, 585 Pa. at 609–12, 889 A.2d at 538–39 (cataloguing Pennsylvania precedent reflecting the proposition that "evidence regarding a defendant's past violent convictions or conduct does not implicate the issue of his or her future dangerousness"), *with Kelly*, 534 U.S. at 253, 122 S.Ct. at 731 ("A jury hearing evidence of defendant's demonstrated propensity for violence reasonably will conclude that he presents a risk of violent behavior[.]").[1] I am unable to accede to this sort of an approach to a decision of the United States Supreme Court on a federal constitutional issue.

---

1. The majority also appears to conflate the test for prosecutorial misconduct with the standard governing whether a *Simmons* request is required upon a capital defendant's request. *See* Majority Opinion, 585 Pa. at 607–09, 609–12, 889 A.2d at 537, 538–39. However, whether or not a *Simmons* instruction is required to satisfy constitutional due process requirements has little to do with whether or not a prosecutor's commentary or the evidence was proper or improper, or within or outside the range of zealous advocacy or oratorical flair. Rather, the instruction is required on the defendant's request where the proper or improper evidence or argumentation implicates future dangerousness. *See Kelly*, 534 U.S. at 254, 122 S.Ct. at 732.

In my view, the brutal circumstances involved in the Lunarios' killings alone arguably meet the United States Supreme Court's prevailing test for implication of future dangerousness as articulated in *Kelly*.[2] The tendency of this evidence, which was incorporated into the penalty phase of trial, to show Appellant's continuing dangerousness was enhanced by the Commonwealth's presentation of the factual underpinnings of a violent rape in aggravation at the penalty hearing, and the prosecuting deputy attorney general's commentary concerning death as a "solution" to Appellant's status as a killer "beyond the realm," as well as his repeated references to Appellant's "thirst[ ] after the bliss of the knife" and blood lust. The majority's attempt to direct the focus of this evidence and commentary solely to their backward-looking implications seems to me to be ineffectual in light of *Kelly's* explicit guidance. *See Kelly*, 534 U.S. at 253–54, 122 S.Ct. at 731–32 ("A jury's hearing evidence of defendant's demonstrated propensity for violence reasonably will conclude that he presents a risk of violent behavior ... [; the relevance of evidence to the point of future dangerousness] does not disappear merely because it might support other inferences or be described in other terms."). For these reasons, I believe that a new penalty hearing is due under prevailing United States Supreme Court authority.

---

**2.** Notably, in response to a dissenting opinion asserting that under the *Kelly* standard the evidence in a substantial proportion, if not all, capital cases will show a defendant likely to be dangerous in the future, the *Kelly* majority responded, that this "may well be," *see Kelly*, 534 U.S. at 254 n. 4, 122 S.Ct. at 732 n. 4, albeit that it declined to respond definitively.